1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

JOHN GAST, individually         ) CIVIL NO. CV 04-00079
and as Special                  )         DAE-BMK
Administrator of the            ) (Wrongful Death)
Estate of JACQUELINE            )
GAST, and as Guardian Ad        )
Litem for his minor             )
child, AMANDA RENEE             )
GAST, and BROOKE ASHLEY         )
GAST,                           )
                                )
         Plaintiffs,            )
                                )
    vs.                         )
                                )
SUNG KI KWAK, dba SHIN          )
JIN HAWAII TRAVEL &             )
TOUR, a Hawaii Sole             )
Proprietorship; CYNTHIA         )
HATHAWAY,                       )
                                )
         Defendants.            ) DEPOSITION OF
_____) JON HESHKA
                                ) Taken on
SUNG KI KWAK, dba SHIN          ) October 12, 2005
JIN HAWAII TRAVEL &             )
TOUR, a Hawaii Sole             )
Proprietorship; CYNTHIA         )
HATHAWAY,                       )
                                )
         Third-Party            )
         Plaintiffs,            )
                                )
    vs.                         )
                                )
NORWEGIAN CRUISE LINES,         )
INC., and NATIONAL PARK         )
SERVICE,                        )
                                )
         Third-Party            )
         Defendants.            )
_____)

POWERS & ASSOCIATES

Page 22

1  search method that you've told us about; is that
2  correct?
3    A. Yes, it does.
4    Q. Did Ms. Hathaway have a team to do an open-
5  search grid of the area?
6    A. No, she did not.
7    Q. Did she even have the ability to do that?
8    A. No, she did not.
9    Q. Is the measurement that you made to provide
10 some opinion concerning the limited -- strike that.
11      Does the measurement you made lead you to
12 any opinion concerning the search that you've
13 described when Ms. Hathaway went 30 feet up the trail
14 to search for Mrs. Gast?
15   A. I beg your pardon. I missed the first part
16 of your question.
17   Q. Did the measurement that you took 4 days ago
18 have any basis for any opinion concerning the
19 effectiveness or limitation of the search that was
20 done that you described that Ms. Hathaway did?
21   A. Yes, it did.
22   Q. What is that opinion?
23   A. My opinion is that given Ms. Hathaway's
24 limited capacity to observe the landscape in which
25 she was looking that she did not perform an effective

Page 23

1  visual sweep of the area.
2    Q. That's based on what standard?
3    A. That's my own personal opinion.
4    Q. Well, I'm wondering what scientific standard
5  you're basing that opinion on.
6    A. I'm basing that opinion based upon my years
7  of experience as a search and rescuer, as an
8  instructor of search and rescue courses both in
9  Canada and the United States, as a guide, and as a
10 professor of adventure guiding.
11   Q. How many times have you taken people out
12 into a lava field?
13   A. I have never taken anyone out into a lava
14 field.
15   Q. What kind of lava was Mrs. Gast's body found
16 in?
17   A. On new lava.
18   Q. What kind, though? Was it a'a? Was it
19 pahoehoe?
20   A. I do not know.
21   Q. The lava that she was found in, was it red
22 lava? Was it cooling lava? Was it cooled lava?
23   A. It was cooling lava that was hot to the
24 touch.
25   Q. What does that mean?

Page 24

1    A. That a crust forms on the surface and that
2  approximately 2 feet below in this instance, there
3  was evidence of red lava. And according to my
4  understanding of previous depositions, that it was
5  hot to the touch, uncomfortably so.
6    Q. How to the touch how?
7    A. That when you touch it, it is hot.
8    Q. With -- I'm not trying to be facetious here,
9  but when you touch it with what? When you touch it
10 with your hand?
11   A. Yes.
12   Q. When you walk on it with boots?
13   A. My understanding is that when it was touched
14 by a person's hand that it was hot to the touch. And
15 according to Gail Minami-Judd's testimony, I believe
16 that if you were to stand in a spot for more than 20
17 seconds, even standing on it would have been
18 uncomfortable.
19   Q. So your understanding is based upon --
20 concerning cooling lava is based upon the testimony
21 of the rangers that were there that picked up the
22 body?
23   A. That picked up the body on the morning of
24 the 15th.
25   Q. Is that correct?

Page 25

1    A. Yes, it is.
2    Q. I take it you've had no personal experience
3  with cooling lava?
4    A. No, I do not.
5    Q. I'd like to ask you a little bit about your
6  background. How many times have you testified in
7  courts in the United States of America?
8    A. I have never before testified.
9    Q. Have you ever been qualified as an expert in
10 any court in the U.S.?
11   A. No, I have not.
12   Q. The course you teach that you're professor
13 of is called liability of adventure; is that correct?
14   A. Legal liability and risk management of
15 adventure.
16   Q. You teach Canadian law in that course?
17   A. Principally, yes, I do.
18   Q. You also teach the law of the United States
19 of America?
20   A. I do not teach American case law. However,
21 we do reference selected cases that are
22 contemporaneous to what we're studying.
23   Q. Have you ever taught the case law of the
24 state of Hawaii concerning recreation liability?
25   A. No, I have not.

Page 26

1  Q. Are you aware of any of the statutes here in
2  Hawaii concerning recreational liability, whether
3  there are any or not?
4  A. Hawaiian state statutes?
5  Q. Yes, sir.
6  A. No, I do not.
7  Q. Are you aware of what the law is in Hawaii
8  concerning premises liability?
9  A. No, I do not.
10  Q. Do you know whether or not the law in Hawaii
11  is any different depending on whether somebody is on
12  the land and allowed on the land for free or whether
13  they have to pay a fee?
14  A. In the state of Hawaii?
15  Q. Yes, sir.
16  A. No, I do not.
17  Q. Have you ever taught about the discretionary
18  function as used in the federal tort claims act?
19  A. No, I have not.
20  Q. Have you ever testified regarding the same
21  in any court in the United States of America?
22  A. No, I have not.
23  Q. How about in Canada? Have you ever
24  testified to that in Canada before?
25  A. About the discretionary function in the

Page 27

1  United States?
2  Q. Yes, sir.
3  A. No, I have not.
4  Q. You know, sometimes you get cases where you
5  use the law of another jurisdiction, so that's why
6  I'm asking you. I'm not trying to be --
7  A. Of course.
8  Q. Is there such a thing in Canada as a
9  discretionary function for the Canadian national
10  government?
11  A. I am aware that there is, but I am unaware
12  of its detail.
13  Q. In Canada are people allowed to sue for
14  injuries that they receive when they are in a
15  recreational activity?
16  A. Are they allowed to sue?
17  Q. Yes.
18  A. Yes, they are.
19  Q. They can bring suit?
20  A. Yes, they can.
21  Q. I'm just wondering because I know in New
22  Zealand, you can't. I wondering. I thought maybe --
23  your system is different than New Zealand, then?
24  A. Yes, it is.
25  Q. Okay. Great. I don't know anything about

Page 28

1  it. That's why I'm asking.
2     Have you ever testified -- and I may have
3  asked you this, but have you ever testified as an
4  expert for the national park system of the United
5  States before?
6     MR. BURKE: I think he has testified now
7  more than once that he has not testified before,
8  period, so I'll object to the question as just being
9  asked and answered, and at this point it seems rather
10  argumentative.
11     MR. O'CONNOR, JR.: He may have in Canada.
12  I don't know.
13  A. No, I have not.
14  Q. BY MR. O'CONNOR, JR.: Have you ever
15  testified in a case concerning risk management
16  programs before?
17  A. No, I have not testified in a case involving
18  risk management.
19  Q. Have you ever testified in Canadian courts
20  before?
21  A. No, I have not.
22  Q. So you haven't been qualified as an expert
23  in any court anywhere?
24     MR. BURKE: Asked and answered.
25  A. I believe I've stated I have not.

Page 29

1  Q. BY MR. O'CONNOR, JR.: Okay. How much are
2  you charging me for this deposition today?
3  A. I believe the rate is $300 an hour.
4     MR. BURKE: Let the record reflect there's
5  an agreement among counsel and the government counsel
6  that Mr. Heshka will be billing $300, and
7  Mr. O'Connor has agreed to pay him promptly at the
8  conclusion of the deposition. I think it was within
9  30 days.
10     Let the record reflect we're not charging
11  for the cost of bringing this witness here to Hawaii
12  for this deposition, travel, or daily expenses, nor
13  are we charging for any preparation time.
14     MR. O'CONNOR, JR.: All right.
15  Q. BY MR. O'CONNOR, JR.: Mr. Heshka, how many
16  times have you charged $300 an hour before in
17  litigation?
18  A. In litigation?
19  Q. Yes.
20  A. This would be the first.
21  Q. Okay. If I look at your -- what we've
22  marked Exhibit B, which is your -- I'm sorry. That's
23  not even it.
24     If we look at Exhibit D here, which is the
25  signed report, at page 3. If you could take a look

Page 34

1  A. I've done plenty of other research prior to
2 my engagement with this case.
3  Q. I didn't mean it that way. I mean the only
4 research for any legal case you've done is in this
5 particular case?
6  A. That is correct.
7  Q. The rate that you charge is reflected in
8 page 3 of your report that we've marked as Exhibit D?
9  A. Yes, it is.
10  Q. Have you produced any written reports in any
11 other legal case other than this case?
12  A. No, I have not.
13  Q. Have you ever been -- you've never been
14 deposed before?
15  A. No, I have not.
16     MR. BURKE: We've asked these questions
17 about 2 or 3 times over. I think it's pretty clearly
18 established now, Counsel. I doubt his answer will
19 change.
20  Q. BY MR. O'CONNOR, JR.: The trial testimony
21 rate that you put down in your report is a rate that
22 you're going to charge the U.S. government in this
23 case?
24  A. Yes, it is.
25  Q. Those amounts are in U.S. dollars or

Page 35

1 Canadian dollars?
2     MR. O'CONNOR, JR.: Is that a silly
3 question, Mr. Burke?
4     MR. BURKE: Yes. Yeah. I thought so.
5     MR. O'CONNOR, JR.: Why is that?
6     MR. BURKE: I don't see the relevance of it.
7  Q. BY MR. O'CONNOR, JR.: Are the amounts in
8 Canadian or U.S. dollars, sir?
9  A. U.S. dollars.
10  Q. When were you first contacted in this case?
11  A. I believe the date was August 15th, 2005.
12  Q. What were you asked to do?
13  A. At that initial contact?
14  Q. Yes.
15  A. I was asked if I was interested in reviewing
16 a case.
17  Q. What materials were you given in August
18 2005?
19  A. A lot.
20  Q. We have what we've marked as Exhibit B,
21 which is a list of materials.
22  A. Yes, sir.
23  Q. I want to make sure that you've got a copy
24 of that in front of you, sir.
25  A. Thank you.

Page 36

1  Q. Are these all materials that you received in
2 August 2005?
3  A. No.
4  Q. These are all the materials that you have
5 now?
6  A. Yes.
7  Q. What materials did you have when you wrote
8 your report that we've marked as Exhibit D?
9  A. Would you like me to go through item by item
10 on Exhibit B?
11  Q. Well, sure, if you have to.
12  A. Very well.
13     I had item 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,
14 12, 13, and 14.
15  Q. The cases that you note here --
16  A. I beg your pardon. I haven't finished
17 unless -- would you like me to continue?
18  Q. Sure. Go ahead, sir. I'm sorry.
19  A. I had the following cases: 16, 17, 18. I'm
20 not sure about 19. 20 and 21.
21     I had at my disposal all books listed, 22
22 through 29.
23     I had beneath U.S. NPS documents 32, 33, 34,
24 36, 37, 42.
25     And then on the last page, certainly item

Page 37

1 51, 52.
2     There may have been things other than those,
3 but there was -- there were several shipments of
4 documents that were sent to me, and I can't recall
5 precisely when I received them.
6  Q. You have received since your report number
7 15, which is Mr. Martin's testimony; is that correct?
8  A. Yes, it is.
9  Q. You've received number 30, which is the
10 Hawaii Volcanoes National Park search and rescue plan
11 dated May 1, 1980?
12  A. I had that already in August.
13  Q. You had that?
14  A. Yes.
15  Q. Okay. I just want to make sure.
16     I'm sorry. Did you or did you not have the
17 preliminary report by Richard Gill dated March 27,
18 2005?
19  A. No, I did not.
20  Q. Did you have NPS 50, which is number 31?
21  A. Are you referring to number 31? No, I did
22 not have item 31.
23  Q. Did you have 35, NPS management policy 2001,
24 that section that's noted?
25  A. Yes.

**Page 42**

1 rescue as well as the Wendt case.
2   Q. We're only talking about these reports and
3 what you used them for. The 3 expert reports and the
4 supplements that they made.
5   A. Yes, sir.
6   Q. Now, how did you use those reports
7 concerning search and rescue in this Gast case?
8       MR. BURKE: I'll object to the form of the
9 question.
10      Go ahead and answer if you can.
11   A. It's a very difficult question to answer.
12 As I understand the question being asked, how did I
13 use them in the Gast case?
14   Q. BY MR. O'CONNOR, JR.: Well, let me ask you
15 this: Was the Wendt case a search and rescue case?
16   A. It certainly was one of the elements.
17   Q. How did you use that element in this Gast
18 case?
19      MR. BURKE: I'll object to the form of the
20 question as being confusing.
21   A. Search and rescue was an element of the
22 Wendt case, and search and rescue is an element of
23 the Gast case.
24   Q. BY MR. O'CONNOR, JR.: Do you have any
25 opinions concerning the discretionary function in

**Page 43**

1 search and rescue based upon your review of these
2 expert reports in the Wendt case?
3   A. I have an opinion of it based not only upon
4 those reports but upon further research.
5   Q. What is that opinion?
6   A. My opinion is that there is no duty imposed
7 upon the National Park Service to perform search and
8 rescue.
9   Q. Where is that in your report?
10   A. I'm unsure if that is in the report.
11   Q. When did you make that opinion?
12   A. Well, I've just made it to you now.
13   Q. Okay. There's no duty to do a search --
14 just so I'm clear, there was no duty on the park
15 service to do a search and rescue in the Gast case at
16 all?
17   A. That is correct.
18   Q. Is that based on the facts of the Gast case,
19 or is it based on the law? What is that based on?
20   A. It's based upon the law: that there is no
21 statutory duty of the U.S. National Park Service to
22 perform search and rescue.
23   Q. Is there any duty in Hawaii for a landowner
24 to do so if they're a private landowner?
25   A. To the best of my knowledge, there is not.

**Page 44**

1   Q. Well, do you know whether there is a duty or
2 not in Hawaii to look for somebody on your land
3 that's missing?
4   A. To the best of my knowledge, there is not.
5   Q. Do you know what the legal duties of a
6 landowner are in Hawaii?
7   A. No, I do not.
8   Q. So your opinion concerning the duty of the
9 national government concerning search and rescue is
10 based on what law?
11   A. It's based upon case law. And in several
12 cases involving the National Park Service and search
13 and rescue, the courts have ruled that there is no
14 duty on behalf of the park service to perform search
15 and rescue.
16   Q. Have they said there's no duty or that the
17 search and rescue is a discretionary function of the
18 National Park Service?
19   A. The court ruled there is no duty.
20   Q. No duty, period?
21   A. That's right.
22   Q. Any other opinions you have that are not in
23 your report?
24      MR. BURKE: You can ask him all day about
25 opinions. I'm sure he has plenty on many things.

**Page 45**

1   Q. BY MR. O'CONNOR, JR.: I'm just asking. Are
2 there any other opinions that you have that are not
3 in your report that you are going to testify to at
4 trial?
5      MR. BURKE: Depends on what he's asked.
6 I'll object to the question.
7      MR. O'CONNOR, JR.: Well, Counsel --
8      MR. BURKE: I'll object to the question.
9      MR. O'CONNOR, JR.: -- don't be flip about
10 that. Come on. It's fair question.
11     MR. BURKE: No, it's not a fair question.
12   Q. BY MR. O'CONNOR, JR.: Let me ask you this:
13 Are all your opinions contained in your report that
14 you submitted dated September 9, 2005?
15     MR. BURKE: All his possible opinions about
16 anything in the world? I object to the form of the
17 question. Overbroad.
18     MR. O'CONNOR, JR.: You know what, Mike? If
19 you don't just make it legal objections, then we're
20 going to stop and we're going to talk to Barry
21 Kurren, all right?
22     MR. BURKE: Keep asking questions like that
23 and we will. Any opinions in the world?
24     MR. O'CONNOR, JR.: Don't threaten me about
25 my questions that I'm asking. You make your legal

### Page 66

1  A. Yes.
2  Q. Was that -- is it your testimony that what
3  was -- the eruption site on October 14, 2002,
4  preserved the pristine quality of that area?
5  A. Are you asking if I believe that the area
6  has been preserved?
7  Q. I'm just asking you whether your
8  understanding of how the area was on that day
9  preserved the pristine quality of that area.
10  A. Yes, I do.
11  Q. So that policy was being met by what the
12  superintendent and the park service were doing down
13  at the eruption site area on October 14, 2002?
14  A. That is correct.
15  Q. Moving to your third -- the next page, the
16  paragraph that's marked 3.
17      Oh. Backing up, do you have any background
18  regarding standards to be used in signage?
19  A. My primary engagement with this case is with
20  regard to search and rescue.
21  Q. Okay. I'm just wondering.
22  A. It appears that there's significant spillage
23  from signage into this case. I couldn't help but
24  bumping into it.
25  Q. Okay. Well -- and I understand your

### Page 67

1  primary -- but the report says that you're also
2  making opinions about liability of adventure. Is
3  that right?
4  A. I believe the focus of my report was with
5  respect to search and rescue and not the liability of
6  adventure guiding.
7  Q. Okay. Do you know whether there are any
8  regulations concerning signage that require anything
9  be put into any of the signage that should have been
10  down at the eruption site on October 14, 2002?
11  A. I've not represented myself as an expert on
12  signage.
13  Q. Okay. Let's skip on, then, to your
14  paragraph numbered 3, which is on the next page,
15  which is -- and I say "the next page." It's the page
16  that has footnotes 15 through 19. You say in the
17  second paragraph of that, "Mr. Gill overlooks the
18  fact that of the approximately dozen bikers and
19  guests who were left by tour groups at or near the
20  end of the Chain of Craters Road all found their own
21  way out." Where did you get that information?
22  A. From Paul Ducasse's deposition.
23  Q. Are you aware of any hikers in the eruption
24  site area who had to be assisted by rangers or
25  medical personnel?

### Page 68

1  A. Who were lost?
2  Q. Any hikers in that area.
3  A. I am aware of an incident involving a youth
4  being scalded, but I'm only peripherally aware of
5  that. I am not aware of any injuries that have been
6  incurred by hikers or guests that were left behind.
7  Q. You're aware of somebody falling off of a
8  cinder cone in that area?
9  A. No, I'm not.
10  Q. You're aware of a hiker being lost and being
11  found in the Holei Pali?
12  A. Is this the gentleman who was found 5 days
13  into the search?
14  Q. You're talking about the guy that was found
15  by the helicopter just recently, right?
16  A. I'm not sure.
17  Q. No. It was a lady.
18  A. Then I guess not.
19  Q. How about the guy that was found 5 days into
20  the search? Was he found after you wrote this
21  report?
22  A. My awareness of that event came after this
23  report was written.
24  Q. Now, you indicate that, "Given that prior to
25  October 2002 when all of the hikers and guests who

### Page 69

1  were left behind found their own way out, the Park
2  Service response not to initiate a search was
3  reasonable." Is that your opinion?
4  A. Yes, it is.
5  Q. That's based on risk control measures?
6  A. That is based upon my 7 years of experience
7  and expertise with search and rescue on 4 continents,
8  the courses that I've taught to a myriad of different
9  jurisdictions with respect to what factors contribute
10  to initiating a search.
11  Q. You're talking about not initiating a search
12  at all, and that's reasonable in this situation?
13  A. No, that is not what I said.
14  Q. When you say "the Park Service response not
15  to initiate a search was reasonable," is there some
16  kind of search it was reasonable to have done in this
17  situation?
18  A. I believe I previously mentioned that there
19  are circumstances in which a search -- beg your
20  pardon. There are circumstances in which a search
21  could have been initiated had other facts come to
22  bear.
23  Q. I'm talking about this particular situation
24  and your opinion. Is your opinion only based on --
25  well, what is your opinion based on?