IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN GAST, individually, and as Special Administrator of the Estate of JACQUELINE GAST, and as Guardian Ad Litem for his minor child, AMANDA RENEE GAST, and BROOKE ASHLEY GAST,<br><br>Plaintiffs,<br><br>vs.<br><br>SUNG KI KWAK, dba SHIN JIN HAWAII TRAVEL & TOUR, a Hawaii Sole Proprietorship; CYNTHIA HATHAWAY,<br><br>Defendants. | CIVIL NO. CV 04 00079 DAE BMK (WRONGFUL DEATH)<br><br>DECLARATION OF RICK GILL, PH.D., CHFP, CXLT |
| SUNG KI KWAK, dba SHIN JIN HAWAII TRAVEL & TOUR, a Hawaii Sole Proprietorship; CYNTHIA HATHAWAY,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>NORWEGIAN CRUISE LINES, INC. and NATIONAL PARK SERVICE,<br><br>Third-Party Defendants. | |

## DECLARATION OF RICK GILL, PH.D., CHFP, CXLT

RICK GILL, under penalty of perjury under the laws of the State of Hawaii, hereby declares that the following are true:

1. I traveled to Honolulu, Hawaii and was available to be deposed on or about September 23, 2005. None of the parties were willing to pay my compensation and deposition travel fee. My standard rates are $300 an hour, as well as a $500 flat fee, cost shared across clients for travel time and expenes from the mainland to Hawaii and return. These are usual fees that I charge. Although my deposition was scheduled, and I blocked out an entire 8 hour work day during my trip to Hawaii that week, the parties decided not to pay my fee and did not depose me.

2. In the present case, it is clear that there are several regulations that require the Hawaii Volcanoes National Park employees to take action at the eruption site including:

   a. 36 C.F.R. § 1.5 and § 1.7 require that if the superintendent of a park closes a portion of the park that notice be provided to park visitors including the posting of signs along the boundary of the park. The form of the signs is set forth in the C.F.R. My review of this matter reveals that the signs were not properly posted along the north side of Chain of Craters Road and that

2

Mrs. Gast's body was found approximately one-half mile inside the closed area.

b. The American National Standards Institute (ANSI) Z535 series on warning signs, which are the premier nationally recognized standards for warnings contains specific requirements concerning color of warning signs. The NPS Sign Manual specially requires that the NPS comply with ANSI Z535 color requirement (i.e. Page 4-4) and these requirements were not followed in this particular case. In fact, Mr. Fake's testimony concerning what signs were posted on October 14, 2002 makes it clear that there was no apparent rhyme or reason to the color scheme of the signs as posted on that date. This color requirement would apply to the closure signs, as well as to any and all warning signs on site at the eruption site. This requirement was not followed on any of the signs at the eruption site except for the "saw-horse" Area Closed Sign that the NPS claims was designed for use only along the makai side so as to close off the bench area of the site.

c. The ANSI Z535 standards are pointed to as a requirement that must be followed by the NPS in designing warning signs. As

noted in my report, there are repeated instances where the ANSI Z535 series of standards were not followed including in the closure signs, as well as all other warning signs at the eruption site, as noted above, with the sole exception of the makai bench area sign. Further, on October 14, 2002, the eruption site was a subject of an Incident Command and an Incident Action Plan had been instituted for October 14, 2002 that indicated that the Incident Command would, among other things, provide information on eruption site hazards through signs, brochures, displays, media interpretation for both visitors and park employees. The Incident Action Plan also noted this information be photographed and documented. Proper signage was not instituted pursuant to this Incident Action Plan. Further, the signage and/or brochures or other warnings were not properly documented pursuant to the Incident Action Plan; in fact there was no such documentation for weeks prior this incident, nor for weeks after this incident. There is no evidence the NPS ever complied with their own documentation requirements at the eruption site; in fact, the deposition testimony of the various NPS personnel indicates that this task,

which was mandated by their own Incident Action Plan, was not ever done.

3. Importantly, there was no warning sign posted concerning the dangers of cooling lava and such a warning sign was necessary at the eruption site of October 14, 2002. Nor was such warning information provided in any park brochures, kiosks, informational displays, and so forth.

4. Further, the coordination and training of the eruption crew and Taures Garcia was defective and insufficient. The crew set out the signage and trails and eruption crew and Mr. Garcia had contact with the public. Ms. Minami-Judd indicated that she did not follow any park procedures in training these individuals and neither did she nor Mr. Ducasse read or apply NPS 50 or the NPS Sign Manual to any of their training or signage in the Incident Command.

5. It appears the National Park Service is signatory to search and rescue protocols as set forth in the 1999 National Search and Rescue Plan; the NPS did not comply with these requirements in this instance.

6. As specifically stated, in "bold" type, in Chapter 2-1 of the NPS 50, requirements of the document "are mandatory and unless otherwise stated." As noted in my report, there are multiple requirements in NPS 50, which the document clearly notes as mandatory (i.e. "shall," "must," "will," etc.) that the NPS did not

follow that are cited in the attached report including, but not limited to, the following sections of NPS 50:

    a.    Chapter 1, pg 1: Program requirements include the following "mandatory requirements" for which Item G requires the NPS only acquire items that meet established national consensus safety standards (i.e. all of the relevant subject signs grossly violated ANSI Z535 series standards);

    b.    Chapter 1-5: Regional Directors require all establishments "formally inspected" at least annually;

    c.    Chapter 2-1: must develop annual action plan; must prepare documented safety plan

    d.    Chapter 5-1: "minimum requirements" for inspections include, "shall be" formally inspected annually;

    e.    Chapter 6-13: a formal Board of Inquiry is "required" for all deaths, including photographing of all potentially pertinent evidence (i.e. the NPS did not take a single photograph of any of the warning signs or informational signs that allegedly were in place at the time of this incident);

    f.    Chapter 22-1: "Required" to establish a public safety program.

7. The NPS completely failed to follow the requirements of NPS 50 and also failed to follow standard practice in the initiation of a risk management plan concerning the eruption site.

8. The NPS also failed to comply with **mandatory** requirements of its NPS Sign Manual; while the focus of the NPS Sign Manual is admittedly on roadway signs, the NPS allegations that the NPS Sign Manual **only** applies to roadway signs is patently false. For example, in Chapter 4 entitled "General Functions and Categories of Signs," starting on page 4-4 there is an entire section dedicated to: "Bicycle Trail Signing"; "Safety Signs", which includes categories such as "Fire and Danger" signs, "Safety and First Aid Equipment" signs, and "Radiation Hazard" signs, all of which are **required** to comply with ANSI Z-535 and not the Manual for Uniform Traffic Control Devices (i.e. the national requirement for roadway signs); "Pedestrian Signs", including "those located along trails"; "Interpretive Signs/Wayside Exhibits"; and "Trail Markers/Backcountry Signs." It should should be self evident from the titles of these categories of signs alone (i.e. without reading the detailed requirements), that the NPS Sign Manual does **not** apply to **only** roadway signs and nothing more. The NPS failed to comply with their own **mandatory** requirements as set forth in the NPS Sign Manual including:

a. Chapter 3, page 3-4: The Park Sign Committee "will" conduct annual inspections of the signs and review the Park Sign Plan (i.e. there was no plan for the eruption site, much less an annual inspection by a qualified committee).

b. Chapter 4, page 4-4: Whenever a hazard might result in an injury, signs warning of the hazard "must" be installed and warned in accordance with ANSI Z-535.

9. The NPS also violated **manadatory** requriements of the Department of the Interior – Department Manual. For example, Chapter 4, Section 4.1 sets forth what it notes to be "minimum requirements." More specifically, Section 4.3 E list "special requirements" that "will include"; Item (8) within that list includes the latest edition of all ANSI standards.

10. Norwegian Cruise Lines knew that there would routinely be passengers that were either late returning and/or would miss the vessel but had no plan in place for those passengers who were not on the NCL-sponsored trips. Norwegian's plan called for complete access control to the ship as part of the safety program. Mr. Corrin testified that the swiper system on Norwegian Star was not working properly since the crew was not properly trained in its use. As a result, Mr. Corrin admitted that there were numerous swiping errors, not just the 14 that were listed as still not on-board when the vessel lifted its gangway so as to depart

the pier at Hilo Harbor on October 14, 2002. Mrs. Gast was the only passenger confirmed off the vessel at that time. The NCL crew was informed before sailing by a passenger from Ms. Hathaway's tour group that a Norwegian Star passenger was left at Volcanoes National Park. Further, Mr. Gast repeatedly informed NCL employees at the front desk over the course of at least an hour that his wife was missing. Mr. Gast was told that if his wife was off the vessel, that the vessel would not leave without her. Mr. Corrin interviewed Mr. Gast initially about one hour into the voyage and it was his impression that there was a marital dispute; hence he failed to take appropriate action. It was not until 5:05 p.m. when Mr. Corrin viewed a photo/video of Mrs. Gast leaving the vessel and decided that the situation was not a marital dispute. Mr. Corrin was the chief of security for Norwegian Star but he did not know who the proper police entity on Hawaii was or who to contact: Mr. Corrin mistakenly thought the DLNR was the state police. The Hawaii County police was not notified until 6:00 p.m., approximately 6 hours after Mr. Gast first reported his wife as missing. It does not appear that the police were notified by either employees of Norwegian Star.

11. NCL claims that in a missing passenger situation it informs the ship agent who is responsible for the missing person; however, ship agent Amelia Manera was catching an airplane to Honolulu at 1:45 p.m. on October 14, 2002 when the ship claims it reported Mrs. Gast missing to the ship agent.

9

12. Cynthia Hathaway informed Jamie Kailiawa of AKAL that she had left a ship passenger at Volcanoes National Park. Jamie did not properly provide this information to any appropriate authority, including anyone from the ship until approximately 1:30 p.m. on October 14, 2002, well after the ship had sailed. Ms. Kailiawa indicated that she told ship agent Joe Tabisola that a passenger had been left at Volcanoes at this time.

13. The failure of NCL to have a plan that would even allow for the communication of such critical safety information, much less to gather such critical safety information concerning a missing passenger, particularly one that NCL knew or should have known was missing from multiple sources, was a failure of its risk management program at several levels.

14. Further, AKAL failed to have a proper safety and a risk management plan in place concerning the creation and implementation of proper and effective lines of communication. There was no plan for communicating critical safety information about missing passengers and what protocol to follow when passengers are reported as late or missing. AKAL employees were not properly trained to identify hazardous conditions, there was no proper protocol established, there were no training regarding data collection, communication, and documentation; there was a failure to establish proper lines of communication among employees of the various organizations immediately involved in this

incident, as well as with other key entities such as the police. AKAL also failed to establish proper emergency procedures and protocols for such a well known and recurring event as late returning and/or missing passengers.

15. In my opinion, these various failures, which are discussed in more detail in my report, were root causes of the death of Mrs. Gast.

DATED: Honolulu, Hawaii, November 10, 2005.

_____
RICK GILL, PH.D., CHFP, CXLT