

June 26, 2005

Dennis O'Connor Junior
c/o Reinwald, O'Connor, & Playdon
733 Bishop Street
24th Floor, Makai Tower
Honolulu, Hawaii 96813

**Re: Gast vs. Sung Ki Kwak, et al.**

Dear Mr. O'Connor:

As you requested, I reviewed the additional file information your office provided me concerning the death of Ms. Gast at the Volcano National Park. The purpose of this letter is to provide the details concerning the facts and data, as well as the underlying safety principles and risk management methodology that form the bases for my final opinions.

## SYSTEM DESIGN FACTORS

### Overview
In order to ensure the safety of park visitors and employees alike, a governmental agency such as the National Park System (NPS) must employ some type of basic safety or risk management program; business entities such as the various defendants in this case must also employ risk management programs to ensure the safety of their employees, patrons, and the general public as well. In fact, the mandatory minimum requirements of such a program for the NPS are specified in a variety of the discovery documents (i.e. various Executive Orders, the Department of the Interior Manual, NPS 50, the National Parks Sign Manual, etc.). To be effective at minimizing the potential harm to people, any risk management program must be comprised of five basic components: Hazard Analysis, Develop Plan, Implement Plan, Evaluate Plan, and Documentation. Each of the steps and how they relate to Ms. Gast's death are discussed in the following sections.

### Hazard Analysis
A hazard analysis is a process whereby the various foreseeable tasks performed by the user (i.e. the manner in which the person interacts with the facility or system) are analyzed to identify potential hazards under the varying environmental conditions that exist where these tasks are accomplished. In the case of Ms. Gast's accident, the relevant tasks would be those associated with people that are visiting the eruption site area. It is

---

2104 West Riverside • Spokane, WA 99201 • 509-624-3714 telephone/fax

EXHIBIT "A"

also particularly important in this case to consider both the general lack of knowledge of the typical visitor (i.e. most people have never been to an active volcano), as well as the myriad of environmental hazards (i.e. extreme heat of the air and harden lava, fumes, bench collapse, etc.), most of which are either unknown or not fully appreciated by the novice visitor.

A hazard analysis is comprised of two key components; an a priori analysis (i.e. one that is performed before there is an accident or near miss) and a post hoc analysis (i.e. one that is performed after there is an accident or near miss). It is not the intent of this report to delve into the details of a comprehensive hazard analysis, nor would it be particularly relevant. As it pertains to this accident, the relevant issues for the two types of analysis are:

*A Priori*
1. As stated in NPS 50, parks can pose a significant safety risk to the uninformed public; safety efforts of park must be focused on educating the visitor on proper safety precautions; each area must design its own safety plan (i.e. pg iii). NPS 50 requires the NPS to periodically investigate and evaluate safety hazards, formulate action plans and a safety program with appropriate signage and other precautions against hidden dangers.

2. There is no evidence that the Park Service undertook any such investigation, analysis or safety plan for the eruption site. The testimony cited below speaks volumes regarding the NPS' failure to meet this standard; in short, none of the NPS rangers that were deposed had ever reviewed NPS 50 and its requirements.

3. Via the Hawaii Tribune Herald there had been 6 to 7 lava related deaths at the Park from 1993 to 2000.

4. The Honolulu Star reported that via the Park, it is not uncommon for tourist to not get back to tour buses on time and they must then find their own way back.

5. Via miscellaneous records provided by NPS there have been multiple past incidents of hikers dying and/or being seriously injured, some of which included those stressed by heat/dehydration. It is also noted that despite the mandatory requirement that a formal Board of Inquiry be conducted if there is a death of a park visitor (i.e. as discussed below), there is no evidence to date that the Park did so. Such a failure is critical in that it means the root cause(s) of the death will not be identified and hence similar accidents will likely needlessly repeat themselves.

6. National Park News release claimed that lava watching is the island's hottest attraction noting that within hours of the Chain of Craters Road reopening there were 1,000's of visitors at the eruption site and the line of parked cars was over 2 miles long. (Note: it is known that there will be large numbers of people attempting to see red lava).

7. Ranger Ducasse, the Park's Chief Ranger, testified that:
    a. The Park set up the Incident Command since there were 1,000's of tourist thronging to see red lava.

2

b. There were an average of 2,000 visitors per day and as many as 4,500 per day at the eruption site.
c. The Park considered it an emergency situation to have 1,000's of people per day at such a remote location.
d. Visitors do occasionally get left at the eruption site.

8. Ranger Minami-Judd, a supervisory level ranger and the Operations Chief for the eruption site, testified that:
   a. The Incident Command was setup because there were major flows, with 1,000's of visitors and the Park was concerned about their safety.
   b. There were 1,000's of visitors daily at the eruption site.
   c. There area north of the Chain of Craters Road was closed because it was an active lava flow and the Park was concerned that visitors could become entrapped.
   d. On the day of the accident there were approximately 2,300 visitors since it was "Boat Day" (Note: indicating the Park knew that there would be more visitors when the cruise ships were in port).

9. Mr. Chestnut testified that it was the first volcano he had ever seen in his life; that he had no idea what to expect. (Note: which would be typical of many if not most of the park visitors).

10. Mr. Corrin, NCL's head of security on the Star, testified that they have had many missing passengers in the past. (Note: NCL knows that such emergencies regularly occur)

11. Jamie Kailiawa, AKAL supervisor, testified that passengers come back late to the ship lots of times. (Note: AKAL knows that such emergencies regularly occur).

*Post Hoc*

1. If a post hoc analysis is to be effective in improving safety it is absolutely mandatory that any and all accidents and/or near misses be thoroughly and properly investigated by trained and knowledgeable investigators. The investigations must be properly documented, including photographs and interviews of the victim(s) and any/all potential witnesses. Lastly, the accident reports and near misses must be analyzed individually and then reviewed as a group to identify commonalities and potential patterns, by trained professionals to determine the root cause(s) of the accidents and near misses.

   It is absolutely critical that the underlying root cause(s) be identified so that corrective action can be implemented; falsely attributing the failure mode ensures that needless similar accidents will be repeated over and over. It should also be noted that this is a serial process from being to end; compromise any single step of the process and the overall process will fail. In this case, the evidence is irrefutable that the defendant's risk management programs were ineffective at all levels of the process. The failure to have even a modestly effective post hoc investigation/analysis program is a willful disregard for safety. In effect, the failure to have a meaningful and effective program, as mandated by the basic

3

principles of risk management essentially constitutes a conscious and willful decision to repeatedly expose park visitors and/or patrons to known hazards, knowing full well that will be at risk for serious injury and/or death.

2. The Department of Interior Manual repeatedly mandates the need for an effective post hoc safety plan, which was not properly done; examples include:
   a. Section 2.4.G: Department Designated Agency Safety and Health Official (DASHO) shall appoint trained investigators for immediate investigation of serious accidents
   b. Section 2.7.H: Heads of Bureaus shall require accidents to be reported and investigated
   c. Section 2.8.G: Bureau DASHO shall appoint trained investigators for serious accidents
   d. Section 2.9.F.(5): Bureau Safety and Health Manager ensures accidents are investigated and analyzed
   e. Section 7.3.A: supervisors will record all incidents and accidents onto SMIS
   f. Section 7.3: thru out this section are detailed accident reporting requirements for all/various management level employees
   g. Section 7.3.J: Bureaus will establish appropriate procedures to review accidents
   h. Appendix 1: specifies process for preventing the recurrence of similar accidents

3. NPS 50 also repeatedly mandates specific requirements for post hoc investigations that were not properly followed; examples include:
   a. Section 2-2: must document accident investigation methods and how analyzed to eliminate hazards
   b. Section 6-1: NPS responsible to report all accidents/incidents to SMIS
   c. Section 6-13: Board of Inquiry is required for any serious accident; purpose is identify root cause and take corrective action; accident area to be secured for Board and photos taken for Board
   d. Section 22-3: all accidents should be investigated
   e. Section 26: instructs NPS personnel, "Do not document any opinions about NPS negligence." This is patently contradictory to proper safety protocol and completely undermines any meaningful post hoc investigations and their ability to implement meaningful corrective actions.

4. The NPS failed to identify, document, or photograph the signs that were or were not in use on the date of the accident.

5. Mr. Corrin testified that there was no post hoc analysis of his procedures and investigation. Incredibly, Mr. Corrin testified that in retrospect he would not do anything any different.

6. NCL failed to conduct any post hoc interviews of other travelers, such as Mr. Chestnut, that were with Ms. Gast. Nor are there any records to indicate that NCL conducted in

4

interviews or investigations of any of their likely/known failures (i.e. swiping errors, failure of security to detect swiping errors, breakdown in communications with AKAL, breakdown of communications within the ship, Mr. Corrin's failure to initiate a timely investigation and search because of his "hunch" that Ms. Gast was not really missing but rather it was only a marital dispute, failure of the ship agent to remain in port and perform her duties, etc.).

7. Ms. Kailiawa testified that no one from AKAL interviewed her post hoc concerning Ms. Gast's death. Nor is there any evidence to indicate that AKAL conducted any type of investigation as to why they failed to properly communicate and respond to an emergency condition (i.e. Ms. Hathaway's reporting of Ms. Gast being left at the eruption site).

*Hazard Analysis Summary*

1. NPS
    a. The NPS was aware of numerous life threatening hazards associated with the eruption site.
    b. The NPS knew that there were 1,000's of naïve visitors being exposed to these hazards every day given their desire to get as close to the lava as they could.
    b. The NPS was aware that visitors were being left stranded in a remote, harsh, and life threatening environment (i.e. the eruption site).

2. NCL knew that passengers were disembarking the ship in a location that was foreign to them. NCL also knew that passengers would frequently fail to return to the ship (i.e. the sole location of their money, medication, medical equipment, health care providers, etc.) on time and that the ship would leave port and be completely inaccessible for several days.

3. AKAL knew that passengers would fail to return to the ship on time and thus be stranded in a foreign location for several days.

4. The defendants should have developed proper safety protocols, including training their employees accordingly, to control for such emergency conditions and the associated hazards.

**Plan Development**
The goal of this step is to develop a plan or method for eliminating or at least minimizing foreseeable hazards. When generating or creating a plan, the safety and human factors profession uses a three-level hierarchical process, the fundamental principle of safety.

The first tier or the best alternative is "safety by design". In short, this calls for alternative designs such that either the hazardous condition is eliminated or the user is removed from the vicinity of the hazard (i.e. such as the remote manipulation of hazardous waste). This is the first level of the hierarchical process because it is by far the most effective way of ensuring safety. If for some reason safety by design is not possible or feasible, the second best alternative is "guarding" or providing a barrier between the user and the potential hazard. However, it must be recognized that this second tier should only be

5

employed when safety by design is not a viable alternative because it is not nearly as effective (i.e. the hazard still exists, guards are not fool proof). The final tier is "persuasion control", using warnings, training, or other types of human intervention so as to "persuade" people to behave in a certain manner to ensure user safety. It is noted that for persuasion control to be effective it requires, first and foremost active participation on behalf of those that are in control of the hazard (i.e. in this case the defendants), as well as that of the user that is exposed to the hazard (i.e. the park visitor, the cruise ship passenger, etc.). Persuasion control is the last tier of the hierarchical process because it is known to be limited in its effectiveness.

In this case it is not feasible to have implemented safety by design or guarding. Thus, it becomes absolutely mandatory that the defendants develop a scientifically sound persuasion control system. Given the known limitations of any such an approach it is critical that trained professionals take a lead role not only in the development and implementation of such a system, but in its ongoing evaluation and refinements as mandated by basic safety and risk management principles including the various government documents discussed above.

The intent of this section of the report is to focus the discussion on the most relevant issues of developing a proper plan to control the hazards that were likely contributors to Ms. Gast's accident. The most salient items include:

1. The Department of the Interior Manual specifies a wide range of mandatory components to the park services' safety program, which there is no evidence that the Park did properly. Examples include:
   a. Section 1.3.A: provide safe conditions for visiting public
   b. Section 1.3.B: include safety as integral part of all operations
   c. Section 2.7.I: Heads of Bureaus shall require formal inspections at least annually
   d. Section 2.8: Bureau DASHO shall submit annual safety action plan
   e. Section 2.9.F.(5): Bureau Safety and Health Manager ensures accident prevention plans are developed
   f. 4.3.E.(8): Departments shall adopt latest ANS standards (Note: none of signs posted at the eruption site on the date of the accident were compliant with basic principles for designing warning signs, much less ANS or ANSI compliant)
   g. Section 6.1.A: there will be formal safety inspections by trained experts at least annually
   h. Section 6.1.E: if imminent danger, initiate immediate corrective action will be implemented
   i. Section 23.1: specifies the minimum requirements for protecting the visiting public from recognized hazards
   j. Section 23.3: each Bureau will establish a safety program that:
      A: inspects for public hazards
      F: provide training for hazard recognition, first aid, and CPR for employees responsible for public safety
      G: provide instructions and signs to alert public of potential dangers
      H: investigate and report public accidents

6

2. Likewise NPS 50 specifies a wide range of similar mandatory components to the park services' safety program, again for which there is no evidence these mandatory requirements were met. Examples include:
    a. Section1-1: Objectives are to reduce the frequency and severity of accidents; to provide for safety from recognized hazard
    b. Section 1-1: must have a staff of safety professionals to provide advice
    c. Section 1-2: must train employees to recognize hazards and take corrective action
    d. Section 1-2: acquire only items that meet established national consensus standards; as noted previously, the alleged warning signs were in gross violation of the applicable safety standards
    e. Section 1-2: **requirements of NPS 50 are mandatory unless otherwise stated**; this appeared to be in an emphasized print font in the original document
    f. Section 1-2: Director submits annual reports on serious incidents to Secretary of the Interior
    g. Section 1-3: Associate Director serves as DSHO, appoints boards for immediate investigation of serious accidents, and submits annual safety action plan; yet there is no evidence that any such plan was ever developed
    h. Section 1-5: NPS Safety Manager reviews SMIS accident data and takes corrective action
    i. Section 1-5: Regional Director requires formal safety inspection and abatement schedule at least annually
    j. Section 1-6: Regional Safety Manager conducts 3 year evaluations, reviews accident/incident reports to ensure accurate and complete, and takes action to correct deficiencies
    k. Section 1-6: Superintendents to supervisors ensure proper safety training to all employees, inspect for hazards and abate ASAP, and appoints full time safety specialist to assist site manager
    l. Section 2: this chapter is dedicated to the necessary steps for the Annual Safety Action Plan
    m. Section 2-1: must develop an Annual Safety Action Plan
    n. Section 2-4: public safety program must be detailed including public awareness and programs for identified problems
    o. Section 2-5: program responsibilities include: Annual Safety Action Plan, Regional Documented Safety Programs, and Park Documented Safety Programs
    p. Section 3: this chapter sets forth minimum safety standards
    q. Section 3-1: NPS should adhere to all safety and trade standards; these are **minimum** (emphasis added) acceptable level of safety for the park service
    r. Section 3-2: safety officer should have access to complete set of standards including ANSI
    s. Section 3-3: if conflict, more stringent standard applies
    t. Appendix 4-2, page 25: safety committee meets monthly and minutes distributed to supervisors and posted

u. Appendix 4-2, page 31: mandates are variety of fundamental safety requirements such as:
    - annual inspections including trails, overlooks, and visitor centers
    - deficiencies are corrected or warned
    - brochures available to all visitors that **clearly** (emphasis added) identify specific hazards
    - warning signs carry specific information that is easy to read and understand
v. Section 5: this chapter is dedicated to minimum requirements for inspection and abatement
w. Section 5.1: formal inspections annually including comprehensive survey to identify hazards; addition requirements within Section 5 include:
    - more frequent inspections if increased risk of accidents
    - inspections and comprehensive surveys
    - examining accident records and past inspection reports
    - informal inspection should be done frequently
x. Section 6 provides details for accident investigation procedures including:
    - minimum requires that are necessary
    - corrective actions that are necessary
    - mandatory Board of Inquiry if visitor death; purpose is to identify necessary steps to prevent similar incidents
y. Section 8: this chapter addresses mandatory Safety Committee requirements
z. Section 8-1: safety committee objectives include:
    - monitor and make recommendations
    - review findings and confirm corrective measures implemented
    - review accident reports to identify trends
aa. Section 8-2: safety committee meets monthly, minutes must be maintained, and members properly trained; other requirements include those within Section 8-2.5.1 which include:
    - saving human life takes precedence over all other management action
    - strive for injury free visits
    - provide for a safe environment
    - identify hazards
    - apply nationally recognized codes

Section 10: the chapter addresses Safety staffing
bb. Section 10-2: each regional office have full time safety manager
cc. Section 10-4: all NPS units shall have a full time safety specialist
dd. Section 10-5: Park safety officer will meet at least quarterly with park superintendent
ee. Section 10-6: provides a listing of safety responsibilities of all levels of employees
ff. Section 12: this chapter addresses mandatory safety training
gg. Section 12-1: all employees trained so as to perform work in professional manner
hh. Section12-1: training should include familiarization with applicable standards

8

      ii. Section 22: this chapter addresses Public safety
      jj. Section 22-1: specifies the minimum requirements for protecting the pubic from recognized hazards
      kk. Section 22-1: every effort should be made to identify hazards, particularly ones that have caused injuries in past being sure to give care to knowledge of environment of visitor vs. staff
      ll. Section 22-4: Chief Ranger is responsible for preparation of emergency plans
      mm. Section 22-5: Park safety officer responsibilities include:
          -identify hazards
          -review all emergency plans
          -review park signing to determine if it is appropriate for the area
          -identity any additional warning signs that are needed and help create such signs
          -assist in accident investigations

3. The Park Service Sign Manual mandates that safety signs be installed whenever a hazard might be expected to result in an injury. The manual specifically states that the need and placement of such signs must be carefully considered to ensure adequate warning is provided. The manual also mandates that such signs comply with ANSI Z 535. Yet it is unequivocal that the subject signage that was alleged to have been in place failed to comply with these minimum mandatory requirements; furthermore, it was the poorly trained emergency hire personnel that were tasked with determining what signs were needed and where to place them.

For example, consider the literal design of the various signs that were alleged to have been in place; none of them even begin to comply with the minimum mandatory requirements set forth in ANSI Z 535. For example, there is no signal word panel, no message panel, and most had no pictogram. There was no signal word or safety alert symbol, nor were the signs and their associated lettering the proper colors. Perhaps even more importantly, most of the signs failed to clearly identify the hazards and how to avoid it. For example, the "Area Closed" signs that were allegedly in place did not say why the area was closed, nor that there were any potential hazards associated with the area; in short, they were nothing more than an informational sign. Consequently, even if a park visitor were to have seen and been compelled to read the signs, they still would not have been apprised of the underlying hidden hazards.

4. The NPS Management Policies 2001 states that it is the primary source of NPS policies. (Note: there is no evidence that any of the Park rangers that were deposed ever reviewed and/or used this document).

5. Director's Order #50C provides specific risk management protocols the Park must comply with including:
a. The emphasis on safety in parks must be on prevention.
b. All facilities must be inspected on a regular basis.
c. If hazards cannot be removed, protection must be provided.

9

      d. If inherent risks cannot be mitigated via design or other physical means, then the Park must communicate with and educate the visitors.
      e. Incidents must be reviewed and findings and recommendations used to change/improve the risk management program.
      f. Responsibilities of the Operating Unit Manager/Superintendent include:
          -annual self audits
          -if there are risks, they must be communicated such that visitors can avoid them
          -investigate all public safety incidents and implement appropriate corrective action

6. To date, there is no evidence that the NPS ever conducted mandatory a priori hazard analyses necessary to prepare a safety action plan, much less to prepare such a mandatory plan to deal with the hidden hazards associated with the Park.

7. 36 CFR 1.7 mandates that if an area is closed that signs shall be posted at conspicuous locations and at reasonable intervals. As discussed in the implementation section it is unequivocal that the NPS failed to do so.

8. The Parks brochures did provide some safety information. However, the information was embedded in collateral information within the brochures and not readily apparent to park visitors, nor did the brochure clearly convey the gravity of the hazards. Given the Park's failure to properly document their signage at the eruption site, as well as their failure to properly investigate Ms. Gast's death, it is unclear if the alleged warning signs at the eruption site provided the same information (i.e. need for hats, sunglasses, closed toe shoes, long pants, etc.).

9. Ranger Ducasse testified that there was no SOP for the Park rangers to close an area despite the 36 CFR requirements to the contrary.

10. Ranger Minami-Judd testified that:
    a. The Incident Command Team decided on the signs to be used at the eruption site.
    b. The Eruption Crew (i.e. emergency hire personnel) would decide what signs to put up on any given day; they were trained how to do so at weekly meetings but that there was no documentation of such meetings or their content.
    c. Ranger Minassian was the Park's safety officer, yet she was not aware if he ever inspected the eruption site; she never saw any inspection reports from him.
    d. She never trained or discussed with the emergency hires what to do if a visitor was left behind at the eruption site. (Note: despite the fact that the Park knew that such hazardous events would occur)

11. Ms. Hathaway testified that when she reported to AKAL that Ms. Gast had been left at the eruption site, neither Ms. Kailiawa to whom she was reporting it to, nor another female in a red shirt that had come over, bothered to document her reporting of the emergency.

10

12. Ms. Kailiawa testified that:
   a. When Ms. Hathaway informed her that a female passenger was left at the eruption site, that there was no plan in place to deal with the emergency without the passenger's name. (Note: in short, AKAL had no protocol and/or had failed to train their employees as to proper protocol for dealing with such an emergency/hazardous event)
   b. There was no AKAL policy for proper actions/procedures to follow when a passenger was reported as missing. (Note: even though AKAL knew that this would occur)
   c. The only record of the day's events was her own "diary" as there was no AKAL protocol for a documented security log.
   d. Passengers came back late lots of times, but that she was never trained as to proper and/or necessary protocols and procures to follow when such an emergency/hazardous event occurred.
   e. There was no AKAL form to complete when a passenger arrived late.
   f. There was no AKAL policy to contact Harbor Police, HPD, or other authorities when a passenger arrived late.

13. NCL did have a variety of plans pertaining to passengers returning to the ship, but only if they were on an NCL sponsored trip. This is particularly disturbing in that NCL foresaw the potential emergency/hazards associated with late returning passengers, yet had **no** plan in place for those that were not on NCL sponsored trips. For example NCL policies and procedures included:
   a. Important that the Shore Excursion Manager always be there to receive guests.
   b. When it was certain that all excursions had returned the Staff Captain should be informed.
   c. If it was foreseeable that there would be a delayed return, the Staff Captain/Captain should be notified "immediately".
   d. Delayed return forms should be completed and an ETA should be obtained.
   e. Driver's should be told not to speed in order to get back on time. (NOTE: there was nothing in the protocol that identified if the ship would remain in port or sail without the missing passengers)

14. NCL plan called for "perfect" and "complete" access control as part of their safety program. (Note: as discussed below NCL knew this was not occurring due to defective training and implementation)

15. Mr. Corrin testified that:
   a. Either he or his subordinate guards would be called down to the Pier by AKAL if there was a problem with a passenger. (Note: it is undeniable that this plan was not properly implemented)
   b. He was not trained as to who the various and/or appropriate law enforcement agencies were on shore.
   c. The swiper system had been in place since the ship was launched but that the NCL employees were only informally trained as to its use.

11

To summarize:

1. NPS: Based on the evidence available to date the NPS had a variety of detailed documented risk management policies and procedures. Regretfully, as discussed above and in some instances and as discussed below it more detail, it is unequivocal the Park failed to comply with their own mandatory requirements set forth in the various documents. These well documented programs were created with considerable time and expense, by highly trained safety professionals, yet none of the deposed rangers ever referred to them in the performance of their duties, much less studied them and set forth to develop the required safety protocols. In short, the NPS plan for controlling the hazards at the eruption site were on paper, but in reality most of them did not actually exist.

2. NCL: Based on the evidence to date NCL did have portions of a risk management program documented and did have, at least portions, of a communications protocol established. However, there is no evidence available to date that NCL had any documented safety program or risk management protocol in place to address the clearly well know emergency/hazard associated with late/missing passengers that were not on NCL sponsored tours. It is also clear, as discussed briefly in some instances above and in more detail in the Implementation section, that NCL's communication protocols failed on the date of Ms. Gast's death.

3. AKAL: There is no evidence to date that AKAL had any of the basic infrastructure in place (i.e. such as a risk management program, safety program, etc.) that would have led to the creation of a plan to address the known emergency/hazard condition of a late arriving or missing passenger. Thus, it is not surprising that in the rush/frenzy of the loading of passengers that such critical safety information as a passenger being left at the eruption site was not communicated in a timely manner to the proper authorities.

**Implementation**

Once the plan is developed, the next step is to communicate the required plan to all relevant employees from the highest supervisory level, all the way down to the employee performing the specific task or duty. Steps must be taken to ensure that the plan is implemented and enforced. Without active enforcement even the best plan becomes ineffective. For example, imagine the chaos that would ensue if there were not enforcement of traffic laws.

Here again, the intent of this section of the report is to focus the discussion on the most relevant issues of implementing a plan that were likely contributors to Ms. Gast's accident. What is clear, is that there were numerous failures to properly communicate hazard information, as well as failures to communicate and/or implement appropriate safety protocols and procedures, at multiple levels by the various defendants. In addition to the previous examples already noted:

1. Despite the NPS claims that there were numerous "Area Closed" signs all along the northern edge of the Chain of Craters Road from well west of the turn around to the beginning of the trailheads where the lava had crossed the road, the

12

Mansour video fails to show any such signs after the turn around. This is a critically important failure in that this is the last area in which Ms. Gast was last seen; thus she would have likely had to traverse this general area in order to arrive at the location where her body was found. The failure to post proper warnings at "reasonable intervals" is a direct violation of 36 CFR 1.7.

2. Ms. Hathaway testified that:
    a. She saw a Ranger at the turn-around area and that twice, within approximately 10 minutes, she talked to him about Ms. Gast being missing.
    b. She told the Ranger to initiate a search as she had to leave to get her other passengers back to the cruise ship before it departed.
    c. The Ranger acknowledged her communications to him.

3. Mr. Garcia, the park employee whom Ms. Hathaway believed to be a ranger, testified that:
    a. Ms. Hathaway did inform him, one time only, that she had a missing passenger that she was leaving behind as she had to get the other passengers back to the cruise ship.
    b. He didn't say much in response as Ms. Hathaway was frantic; he did tell her that he would keep an eye out for the missing passenger.
    c. It never occurred to him to communicate the emergency/hazard to anyone.
    d. He had no training in what to do if a park visitor was in an emergency situation.
    e. He had no training in emergency protocol.
    f. If he had known something bad could happen, he would have told someone. (Note: this is particularly enlightening in that the Park's hazard communications were so defective that even their own employees did not appreciate the hazards associated with the eruption site).

4. Mr. Gast testified that:
    a. He first informed NCL of his concern about his wife not being onboard around 12:00 to 12:30 PM; at that point in time he was informed his wife had scanned off the vessel.
    b. He returned to the front desk two more times prior to 1:00 PM and was told not to worry that the ship would not leave without her.
    c. Shortly there after, he saw the gangway being pulled and was being reassured that the vessel would not leave without her when the vessel began to move; he was told to go to his room and a PA announcement would be made to locate his wife.
    d. He asked about getting off the vessel and a security guard named Dave advised him to remain onboard.

5. Jamie Kailiawa testified that:
    a. She talked to Ms. Hathaway for approximately 15 minutes, concluded the information should go to the ship's security, yet she failed to complete such communications; she advised Ms. Hathaway to return to the Park and

13

look for Ms. Gast. (Note: given the extended drive time and the harshness of the eruption site this is extremely contraindicated; furthermore, there was no reason for Ms. Kailiawa to believe that Ms. Hathaway was properly trained to conduct search and rescue)

b. She called Amelia, the ship's agent, twice concerning Ms. Gast while the ship was still at the pier but did not leave a message; she did not call Amelia's boss nor did she follow up and call ship security. (Note: such failures clearly demonstrate Ms. Kailiawa lack of training and her inability to identify an emergency condition and follow appropriate safety protocol)

c. She did not talk to a ship's agent until after the Star had left.

d. She was next to Shane, AKAL supervisor, when Amelia called and she informed him of Ms. Gast, yet the information was still not passed onto the ship's security or the ship's agent.

6. Via HPD a missing person report was not initiated until 6:00 PM, over 5 ½ hours from when Ms. Gast was known missing. HPD also noted that they were unable to obtain any additional information as the ship had already left port.

7. Via NCL emails:

a. The Captain was notified by Mr. Corrin that Ms. Gast was missing and had multiple medical risks at 4:40 PM or over 4 hours from when Mr. Gast first reported her as missing.

b. HPD was miss-informed that Mr. Gast had not reported Ms. Gast missing until after the ship had sailed.

c. At 1:26 PM the Captain was notified that Mr. Gast was at the front office concerning his missing wife as the gangway was being pulled and he was assured by NCL staff that his wife was on board as it was a swiping error. At that point there were 14 passengers missing; yet by 1:30 PM Ms. Gast was the only remaining passenger missing.

d. Amelia, the ship's agent who should remain at the pier until the ship sails and all passengers accounted for, is called at the airport at approximately 1:45 and informed of a missing passenger.

8. Mr. Corrin testified that:

a. He thinks there is a written procedure to follow when there is a missing passenger, but to date none has been produced.

b. Approximately ½ hour before sailing he notifies the Captain if there are any missing passengers; (Note: via emails, this was not done until after the ship left the pier)

c. He is the first one notified of missing passengers. (Note: it was approximately 1 hour after Mr. Gast reported his wife as missing that he was notified. Even then he disbelieved Mr. Gast, attributing her absence to a marital dispute without any evidence so support such a conjecture and without informing Mr. Gast of his belief and hence inactions. Nor did he even do something as simple as review or disembarkation photo to confirm his unfounded suspicions; in fact, once he did review the photo, hours later, he properly concluded that Ms. Gast did not leave due to a marital dispute and immediately became concerned for her safety)

14

d. Scanning errors were due to poor swiping practices; this was typical.
e. The ship's agent should remain at port until the ship sails.
f. The crew did not report Ms. Gast as missing to him until over 1 hour after the ship sailed.
g. Not aware Mr. Gast advised to stay onboard; he thinks Mr. Gast should have gone ashore and gone to the police. (Note: In effect, NCL's head of security, the person in charge of the investigation is stating that a passenger should abandon ship and initiate his own investigation)
h. Not until 5 PM that he got the photo of Ms. Gast's morning departure and then concluded it was not a marital dispute; it was at this point he then became concerned for her safety or nearly 5 hours after Mr. Ms. Gast first reported his wife as missing.
i. Never considered PA announcement asking if anyone had any information concerning a missing passenger, nor did he ever consider showing her photo on ship's video system.
j. Contact with DLNR was via email, with not reply; never considered calling.
k. First direct contact with HPD was not until the following day. (Note: the various preceding items clearly indicate that if NCL did have a protocol for missing passengers as Mr. Corrin testified to, he was not properly trained in such a protocol and/or the protocol was grossly defective; in short, Mr. Corrin's response lacked any sense of urgency and only half-heartedly attempted to collect critical and time sensitive information)
l. Ship's agent should stay at pier until all passengers are accounted for.
m. If Mr. Gast reported Ms. Gast missing to front desk it would be reported to him. (Note: it was not reported to him for approximately one hour)
n. Once Ms. Gast was reported missing to front desk it is his responsibility to investigate; yet, he stated he did not meet with Mr. Gast until 2:10 PM, even though his log says 4:10 PM.
o. Security also at swiper station to ensure swipers perform their duties properly. (Note: yet there were 13 swiping errors)
p. Police should have been notified promptly. (Note: HPD not notified until 6 PM)

9. Mr. Chestnut testified that:
   a. Another couple that was on the tour van reported Ms. Gast as being left at the eruption site to NCL personnel as they were being swiped onboard. (Note: NCL security should have been alerted at this point since they were stationed at the swiping station)
   b. That he only glanced at information at Kiosk, he simply followed others. (Note: this illustrates the defective warning system in that it is too localized, not provided at the point of the hazard, and likely to fail when visitors see others "wandering" about as it lowers one's subject risk).
   c. He did not see any signs/displays concerning safety at the kiosk area.
   d. Nothing concerning lava safety at the kiosk.
   e. He did not see any closed area signs north of the road

15

10. Mr. Ducasse testified that:
    a. He did not get the park safety officer involved with the Incident Command or with signing at the eruption site.
    b. He does not recall the park safety officer ever inspecting the eruption site signs or providing any report regarding the signs over the life of the Incident Command.
    c. He never arranged for an annual inspection of the eruption site.
    d. Emergency eruption site personnel are trained to contact a ranger if there is a missing person. (Note: Mr. Garcia was not so trained and failed to do so)
    e. He did not use NPS 50 when he was Incident Commander.
    f. No Board of Inquiry was conducted for Ms. Gast's death; it was alleged that the NPS was in a state of "transition" and thus he was told not to do one. (Note: in March of 2003 there was a visitor death in Haleakala National Park and a Board of Inquiry was conducted).
    g. Mr. Garcia was uniformed because he had public contact. (Note: Mr. Garcia was not trained properly to identify emergencies/hazards).
    h. If Mr. Garcia was informed of a missing person he would expect him to use his "common sense" and call dispatch.
    i. He does not believe that Ms. Gast being reported as missing and her tour van leaving the eruption site without her is an emergency.
    j. Despite the Incident Command requirement to photo and document all signage at all time, it was not done; hence the NPS still does not know what signs were or were not up, nor their location, on the date of the accident.

11. Ranger Minami-Judd testified that:
    a. There were at least a dozen "Area Closed" signs starting from before the turn around to the trail head a ½ mile east of the turn around. (Note: this is contradicted by the Mansour video).
    b. The area that was closed was not documented.
    c. She did not read or use NPS 50, the Sign Manual, nor Director's Order 50 C. (Note: these are the key governing risk management and safety documents for the Park and she is the one that trained all of the emergency hire personnel that were the only personnel stationed at the eruption site and were responsible for laying out and marking the trail and placing signs).
    d. Emergency hire personnel were trained to use radio to report missing persons and to collect information. (Note: Garcia did neither).

12. Ranger Akana testified that there were over 10 "Area Closed" signs that were posted beginning from approximately ¼ mile west of the turn around to the trailheads that were approximately ½ mile east of the kiosk. (Note: Since the Mansour video shows 4 such signs at the turn around, this would leave only few signs to close off a ¾ mile stretch; clearly this would not be an effective warning/closure).

16

To Summarize:
Based on the information presented in the preceding three sections, regarding those issues that were most likely contributing factors to Ms. Gast's death, the defendants knew or should have known of the hazards that contributed to her death. While the NPS did have a comprehensive risk management program documented, it failed to properly communicate, implement, and enforce its own plan. NCL and AKAL failed to have properly developed and/or documented the requisite safety protocols and risk management plans and/or failed to properly communicate, implement, and enforce such plans. In short, it is my opinion that:

NPS
1. Failed to provide proper warnings to the visiting public;
2. Failed to effectively warn of known hidden hazards;
3. Failed to provide warnings at the proper times and/or locations;
4. Failed to provide proper training, particularly to their maintenance staff, with respect to identification of emergency and/or hazardous events and the proper protocol that should be followed;
5. Failed to establish and/or maintain effective lines of communications amongst its employees, as well as outside groups and/organizations.

AKAL
1. Failed to properly train its employees to identify emergency/hazardous conditions or events;
2. Failed to establish a proper protocol for its employees when responding to an emergency/hazardous event;
3. Failed to train its employees regarding proper data collection and documentation when encountering an emergency/hazardous event;
4. Failed to establish proper lines of communications amongst its employees;
5. Failed to establish proper lines of communications with other key entities such as the cruise lines, Harbor Security, police, search and rescue, and so forth;
6. Failed to establish and/or properly enforce emergency response protocols, particularly for the undeniably foreseeable occurrence of late, stranded, or missing passengers.

NCL
1. Failed to properly train its employees to identify emergency/hazardous conditions or events;
2. Failed to establish a proper protocol for its employees when responding to an emergency/hazardous event;
3. Failed to properly train its employees regarding proper data collection and documentation when encountering an emergency/hazardous event;
4. Failed to establish/enforce proper lines of communications amongst its employees;
5. Failed to establish/enforce proper lines of communications with other key entities such as port side security, Harbor Security, police, search and rescue, and so forth;

17

6. Failed to establish and/or properly enforce emergency response protocols, particularly for the undeniably foreseeable occurrence of late, stranded, or missing passengers;
7. Failed to properly solicit/collect critical information in a meaningful and timely manner for a know emergency/hazardous event;
8. Failed to properly monitor/record the flow of its passengers on/off the vessel;
9. Departed from port when it knew or should have known that one of its passengers with acute medical needs was either stranded or likely stranded on-shore.

**Evaluation**

The purpose of this step is to determine the effectiveness of the chosen plan for controlling the identified hazard. In short, "audits" or safety reviews are performed to verify the plan is being properly implemented and enforced. The evaluation process is essential to ensure that the chosen plan is effectively controlling potential hazards and is not introducing any new hazards.

Once again, the intent of this section of the report is to focus the discussion on the most relevant issues of the evaluation phase that were likely contributors to Ms. Gast's accident. Some of the more salient items include:

1. Both the Department of the Interior Manual and NPS 50 mandate that safety programs be evaluated at least every three years (i.e. Section 5.3.A and Section 4-2, respectively); yet there is no evidence that such evaluations were ever done.

2. There is no evidence any of the defendants evaluated their safety and risk management plans either before Ms. Gast's death or after.

3. Particularly disturbing is Mr. Corrin's testimony that in light of all that is now known he would not change anything that he did in his response to this emergency that resulted in Ms. Gast's death.

**Documentation**

The final step in an effective risk management program is to document the safety process, including the plan, its implementation, and evaluation. Documentation is mandatory to provide the infrastructure for controlling risks. It is also essential to ensure that there is accountability for the implementation and enforcement of the plan.

Again, the intent of this section of the report is to focus the discussion on the most relevant issues of the documentation phase that were likely contributors to Ms. Gast's accident. In addition to the items previously noted, some of the more salient items include:

1. NPS 50 mandates that reports of unsafe conditions be kept for at least 5 years (i.e. Section 7-4); yet, there is no evidence such documentation was maintained, much less analyzed and corrective action implemented.

2. Nor is there any evidence any of the defendants properly and effectively documented their involvement in Ms. Gast's death.

## USER FACTORS

The opinions expressed in my initial report concerning those aspects of Ms. Gast's behavior and the underlying bases remain unchanged and hence will not be repeated here. Key factual evidence includes the various testimony and evidence concerning her medical/mental condition, Ms. Hathaway's testimony, and Mr. Ammasi's testimony.

## QUALIFICATIONS AND FEES

I have attached as a copy to this report a copy of CV which details my experience and expertise, as well as a listing of my publications. Also attached is a listing of my sworn testimony for the past 5 years. Finally, I have included a memo regarding my fees and charges. All time that I have spent on this case to date are contained in my billing statements which will be provided upon request.

Please let me know if you have any questions or if I can be of any further assistance.

Sincerely,

Richard Gill, Ph.D., CHFP, CXLT
Chief Scientist