IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JOHN GAST, Individually and as Special Administrator of the ESTATE OF JACQUELINE GAST and as Guardian Ad Litem for his minor child, AMANDA RENEE GAST, and BROOKE ASHLEY GAST<br><br>Plaintiffs,<br><br>vs.<br><br>SUNG KI KWAK, dba SHIN JIN HAWAI'I TRAVEL & TOUR, a Hawai`i Sole Proprietorship; CYNTHIA HATHAWAY, and AKAL SECURITY, INC., a New Mexico Corporation,<br><br>Defendants. | CIVIL NO. **04-00079 DAE-BMK** (Wrongful Death)<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE NO. 1** |
| SUNG KI KWAK, dba SHIN JIN HAWAI'I TRAVEL & TOUR, a Hawai`i Sole Proprietorship; and CYNTHIA HATHAWAY,<br><br>Third-Party Plaintiffs,<br><br>vs.<br><br>NORWEGIAN CRUISE LINES, INC. and NATIONAL PARK SERVICE,<br><br>Third-Party Defendants | |

# PLAINTIFFS' MEMORANDUM
# IN SUPPORT OF MOTION IN LIMINE NO. 1

Plaintiffs hereby move in limine to exclude any arguments submitted NCL (Bahama) Ltd. that its Honolulu Port Agent, Quay Cruise Agency USA, by and through its employees, acted outside the scope of its agency with NCL. At all times relevant to this action, Quay Cruise Agency USA was an agent for Defendant NCL (Bahama) Ltd. when its ships were in port in Hilo, responsible for conducting business for and acting on behalf of the ships, including specifically in searching for missing passengers. Because it was an agent for Defendant NCL, Defendant NCL is vicariously liable for any share of harm caused to Mrs. Gast by Quay through any of its employees or agents. To date, NCL has not alleged any actions on the part of Quay outside the scope of its agency duties. It should therefore be barred at trial from asserting that it is not vicariously liable for anything that Quay (through its employees) did that is determined to be a substantial factor leading to the death of Mrs. Gast.

## I. FACTUAL BACKGROUND

Mrs. Gast was driven to the volcano in a tour van operated by Defendant Cynthia Hathaway, an employee of Shin Jin Hawaii Travel and Tours. After walking a short way down the trail with Ms. Hathway, Mrs. Gast returned to the visitor turnaround area and attempted to get a ride back to the cruise ship by another tour bus operator and several taxicab drivers. All the drivers she spoke to

2

declined her request. One driver she spoke to at approximately 10:30 a.m. described her as pleasant and in no apparent distress.

That was the last time Mrs. Gast was seen alive.

Conditions on and around the trails were intensely hot and extreme on the day of Mrs. Gast's disappearance. One visitor on the tour with Mrs. Gast reported that his wife's shoes melted onto her feet as they walked on the trail to see new lava. Visitors were allowed to go quite close to the flowing lava, and the trails were not well marked.

When Hathaway and the other members of the tour gathered to depart from the flow area at approximately 11:00 a.m., Mrs. Gast was not there. Hathaway looked around the pavilion area. Two passengers looked up the road for Mrs. Gast for several minutes. One attempted to go up the trail to the flow area to check for Mrs. Gast, but was stopped by park rangers, who told him that they were clearing the area because conditions were dangerous, following a methane explosion and the emission of sulphuric fumes.

Hathaway's van was the last to leave the flow area before it was closed due to dangerous conditions. On her way out she told the Park custodian to "keep an eye out" for the missing passenger.

When she failed to show up at her cabin, Mr. Gast became very concerned and reported it to the ship's security. He did not know where she had gone or

3

whether she was some place on the ship. Although there were at least eleven passengers on board who were aware that Mrs. Gast was last seen at the Chain of Craters Road, the ship never bothered to make any announcement or investigate whether any of the passengers had any information about Mrs. Gast. The testimony elicited from one of AKAL's security officers, indicated that the ship's port agent, Quay, was notified she was missing, but did not call the police or engage in any effective search for her. Indeed, the employee of the agent did not even remain in the port area, and sailed off on another ship when it left port between 5 and 6 p.m. No one made any attempt to search for Mrs. Gast at the volcano during daylight hours on October 14, 2002. It was not until early evening that the police were called to come to the port and investigate. Hours later, as the sun was setting, appropriate authorities came to the realization that Mrs. Gast was the person left at the volcano and that she had not returned. By that time it was too late to conduct a search of the area where she disappeared.

II. **QUAY CRUISE AGENCY USA WAS ACTING AS THE AGENT FOR DEFENDANT NCL (BAHAMA) LTD. IN ALL ACTIONS IT TOOK WITH REGARD TO MRS. GAST**

Quay Cruise Agency USA was the so-called port agent for Defendant NCL (Bahama) Ltd. when the Norwegian Star docked in Hilo Harbor on October 14, 2002. Quay employee Joseph Tabisola testified that as agent for NCL, the Quay employee assigned to the ship performed a number of duties for NCL including

arranging pilots, tugs, the berths, linesmen and stevedoring (Exhibit 1: Tabisola Depo, 12:24-25), entering and clearing the ship and reporting any violations of the Jones Act (Exhibit 1: Tabisola Depo, 13: 23-25), coordinating with suppliers of food (Id. at 16: 1-4), receiving shipments, engine spares, mail (Id. 16:18-19). Basically, Quay served as a liaison between the ship and services at Hilo. (Id., 49: 13-14). It would perform routine services, and also other jobs that were not routing when there was a specific, direct contact by one of the Norwegian ships and they would give a request to do this or that. (Id., 51:1-6). These less routing service included ordering medical supplies (Id., 52:20-21), arranging ambulance service, Id., 52: 1-7), following up with hospitals, (Id., 55:1-2). It also included helping locate a passenger who had not made it back to the ship when expected. (Id., 58: 14-22). This type of request had been made of him 10 to 30 times. (Id., 59: 1-2). Mr. Tabisola had a routine he followed when he received a request from the ship to help locate a missing passenger, which included calling customs, Hilo Hospital, rental car companies, and hotels (Id., 61:3, 61:19-20, 64:4). NCL had no employees at the port of Hilo and relied entirely upon the Quay, as its agent.

The testimony of Matthew James Lewis, the 30(b)(6) for Norwegian Cruise Lines (Exhibit 2: Lewis Depo, 8:20-25 – 9: 1) confirms the role of the "port agent", in this case Quay, as the NCL agent with regard to missing passengers. When asked if Norwegian Cruise Lines has any protocols concerning the reporting of a

passenger missing by their traveling companion, "normally the vessel would contact the Port Agent." (Exhitib 2: Lewis Depo, 30: 11-16.32: 7-12). He identified that duty of what the Agent is expected to do with regard to missing passengers as "On the pier, wait for the passenger to return. If the passenger doesn't return, then the agent would normally notify the authorities. (Exhibit 2: Lewis Depo, 33: 8-14, 37:10-12). Quay acted as the liaison between NCL and the authorities in Hilo. (Exhibit 2: Lewis Depo, 42:14-19; 61: 12-22; 73:6-7). Indeed, "the Port Agent is hired to coordinate these efforts, missing person efforts." (Exhibit 2: Lewis Depo, 114:16-18). There is no evidence in this case that Quay did anything outside the scope of its agency duties, although there is a question whether it performed those agency duties adequately in the case of coordinating the search for Mrs. Gast when she failed to return to the ship.

When the Plaintiffs' counsel asked Mr. Lewis whether it is the cruise lines' position that the Ship Agent failed to do anything he was asked or instructed to do, Mr. Lewis was instructed not to answer. (Exhibit 2: Lewis Depo, 103:16-18, 104:12-13). He was also instructed not to answer whether NCI believe[s] that the ship's agent did anything wrong in this particular case. (Exhibit 2: Lewis Depo, 104:25, 105: 7-9).

III.  **NCL IS VICARIOUSLY LIABLE FOR THE ACTS OF QUAY IN THE INSTANT CASE**

The general rule for vicarious liability for the torts of an agent is stated in Section 219 of Restatement Second, Agency:

> Section 219.  When Master is Liable for Torts of His Servants
>
> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
>> a. The master intended the conduct or the consequences, or
>>
>> b. The master was negligent or reckless, or
>>
>> c. The conduct violated a non-delegable duty of the master, or
>>
>> d. The servant purported to act or to speak on behalf of the principal and there was no reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship.

This rule has been adopted and applied by Hawaii's courts.  As explained in *State v. Hoshijo ex rel. White*, 102 Haw. 307, 319 (2003),

> "A **master** is a species of principal and, a servant is a species of agent." ***Restatement**, supra, § 2* cmt. a., at 13. It is well established that "[a] **master** is subject to liability for the torts of his [or her] servants committed

7

while acting in the scope of their employment." *Restatement, supra,* § **219**(1), at 481. *See* <u>Wong-Leong v. Hawaiian Indep. Refinery, Inc.</u>, 76 Hawai'i 433, 438, 879 P.2d 538, 543 (1994) ("Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees [or agents] that occur within the scope of their employment[ ]" or authority. (citing <u>Henderson v. Professional Coatings Corp.</u>, 72 Haw. 387, 391-92, 819 P.2d 84, 88 (1991) (other citations omitted)); *cf.* <u>Lucas v. Liggett & Myers Tobacco Co., 50 Haw. 477, 480, 442 P.2d 460, 463,</u> (" 'A principal who puts a servant or other agent in a position which enables the [servant], while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud.' " (Quoting ***Restatement***, *supra,* § 261 at 570.)), *rehearing denied* (1968). The ***Restatement*** also notes that "[a]n act may be within the scope of employment although consciously criminal or tortious." ***Restatement***, *supra,* § 231, at 512; *see also* <u>Lucas, 50 Haw. at 482, 442 P.2d at 463</u> (quoting ***Restatement***, *supra,* § 231 approvingly). "Vicarious liability under the respondeat superior doctrine ordinarily requires some kind of employment relationship or other consensual arrangement under which one person *agrees to act under another's control.*" Dan B. Dobbs, *The Law of Torts,* § 335, at 910 (2000) (footnote omitted) (emphasis added).

Thus, under long-standing tort principles, NCL is vicariously liable for the alleged negligent acts of its agent, Quay, in the case at hand. Since it has not asserted that Quay did anything outside of the scope of its agency, and in fact prevented it 30(b)(6) witness Mr. Lewis, from testifying in this regard, it should now be barred now from presenting any evidence or arguments to the contrary at trial. It would be absurd to allow NCL to instruct it's 30(b)(6) corporate representative to answer a question about the fault of its agent and then to allow the

NCL to argue to the jury that it should not be responsible for the acts or omissions of its agent either because it was not an agent or that it acted outside the scope of its agency.

## IV.  CONCLUSION

Based on the foregoing evidence and principles, the Plaintiffs respectfully ask that the instant motion be granted.

DATED: Honolulu, Hawaii, May 30, 2006.

_____
MARK S. DAVIS
Attorney for Plaintiffs