9F07268
Joseph Tabisola - September 16, 2005

```
 1
 2              THE UNITED STATES DISTRICT COURT
 3                 FOR THE DISTRICT OF HAWAII
 4
 5   JOHN GAST, individually, and      )
     as Special Administrator of       )
 6   the Estate of JACQUELINE GAST,    )
     and as Guardian Ad Litem for      )
 7   his minor child, AMANDA RENEE     )
     GAST and BROOKE ASHLEY GAST,      )
 8                                     )
                 Plaintiffs,           )
 9                                     ) CIVIL
     vs.                               ) No. CV 0400079 DAE BMK
10                                     )
     SUNG KI KWAK, dba SHIN JIN        )
11   HAWAII TRAVEL & TOUR, a Hawaii    )
     Sole Proprietorship; CYNTHIA      )
12   HATHAWAY,                         )
                                       )
13               Defendants.           )
     _____)
14
15
16                    DEPOSITION OF
17                   JOSEPH TABISOLA
18              SAN FRANCISCO, CALIFORNIA
19                 SEPTEMBER 16, 2005
20
21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   180 Montgomery Street, Suite 800
     San Francisco, CA  94104
23   (415-288-9000)
24   REPORTER:   DENISE WHEELER, CSR NO. 8254
25   FILE NO:  9F07268
```



EXHIBIT 1

1  MR. O'CONNOR: Q. Okay. I can tell you that all of the attorneys here can go ahead and object. And you should listen to the question, and unless the attorney -- and this gentleman sitting here today is your attorney, correct?

A. Correct.

Q. If he instructs you not to answer the question, then he and I or whoever asks the questions may have discussion or we may go to the judge.

But otherwise listen to the question. And what will happen is the attorneys are objecting for the record and for the court to rule on later on, okay.

Can you read that question back to him, please?

(Whereupon the reporter read back the record as requested.)

THE WITNESS: Technically I'm not a manager. That's the title, but I'm not -- it's not a management position.

MR. O'CONNOR: Q. Okay. What were you doing?

A. I had that position. I do basic husbandry service for the vessels.

Q. Those of us that don't understand admiralty are going to have you explain what you mean by that?

A. We arrange pilots, tugs, the berths, linesmen, stevedoring. And can't really name them all right now, but

12

```
 1  other things associated with a vessel coming to a port.
 2       Q.  Were you ever involved with coordinating anything
 3  for any of the passengers when you were working aboard
 4  either the Norwegian Star or the Norwegian Wind?
 5       A.  Not directly.  I don't do any travel arrangements
 6  or anything like that for any passengers.
 7       Q.  Did you ever coordinate medical care for anybody?
 8       A.  If I was asked by the vessel, yes.
 9       Q.  Did you ever coordinate customs services for
10  anybody, US Customs?
11       A.  What do you mean by customs services?
12       Q.  I mean, as the -- as part of your duties did you
13  have any interaction with US Customs?
14       A.  Yes.
15       Q.  What were those interactions?
16       A.  To enter and clear the ship.
17       Q.  I'm sorry?
18       A.  To enter and clear the ship and to ensure -- to
19  report any violations of the Jones Act.
20       Q.  Okay.  You said to enter and clear the ship?
21       A.  Yes.
22       Q.  Okay.  What does that mean?
23       A.  That means any ship that comes into port -- any
24  foreign ship that comes into port needs to be entered into
25  the customs system, and also when it departs it has to clear
```

1  A. Shipments of food, yes, I was involved in shipments of food.

3  Q. And how were you involved?

4  A. We would coordinate with the suppliers.

5  Q. What do you mean by that?

6  A. If they wanted a delivery time, the ship wanted a specific time for food to be delivered, we'd arrange it between -- we'd coordinate between the supplier and the ship.

10 Q. Would you order the food from the supplier?

11 A. No.

12 Q. Who would order the food?

13 A. The ship would directly or their head office.

14 Q. Would you receive shipments at all?

15 A. In our office we received shipments, yes.

16 Q. And what type of shipments would you receive in your office?

18 A. It's various shipments, engine spares, mail.

19 Q. Spare parts?

20 A. Correct.

21 Q. Now, turning back to the Jones Act -- well, strike that.

   Turning back to passengers missing the ship, were you ever involved with assisting passengers after they missed the ship of the Norwegian Cruise Line vessels in

16

1    A.  Grant Karmatsu.

2    Q.  Was he ever your supervisor or just someone you
3  followed around to learn under?

4    A.  Never my supervisor.

5    Q.  Is it fair to say that of these different jobs you
6  mentioned, they concerned acting as a, for lack of better
7  way of putting it, a liaison between the ship and services
8  provided on the ground to the ship?

9    A.  I'm sorry.  Can you repeat that again?

10         MR. BURKE:  Can you read that back to him, please?

11              (Whereupon the reporter read
12              back the record as requested.)

13         THE WITNESS:  Yes, basically a liaison between the
14  ship and services.

15         MR. BURKE:  Q.  Okay.  And were some of these
16  services and liaison items done routinely?  That is, you
17  would always do them at a certain harbor on a certain day,
18  or every time you did them was your work the result of a
19  specific request by the ship?

20    A.  Certain items were done routinely.

21    Q.  Okay.  Can you tell me what those were?

22         MR. CICALA:  I'm sorry, I don't know if he was
23  done.

24         Were you finished?

25         THE WITNESS:  Certain items were done routinely.

49

1  Q. The other jobs that weren't routine you would
2  perform when there was a specific, direct contact by one of
3  the Norwegian ships, and they would give you a request to do
4  this or that?
5  A. Correct.
6  Q. And can you give us a list of what duties you can
7  recall having done for the Norwegian people under that
8  scenario?
9  A. Are we speaking that day or in general?
10  Q. No, just in general.
11  A. Purchasing supplies.
12  Q. Okay. If I could just have a little more detail on
13  that.
14  Did you ever provide or arrange for the providing
15  of medical supplies to the ship?
16  A. Medical supplies to the ship? Yes.
17  Q. Okay. So can you run us through how it would go in
18  arranging for medical supplies to be delivered to one of the
19  Norwegian lines ships?
20  A. I would put in -- I would order medication or
21  supplies through a supplier, pay for it.
22  Q. And who paid your salary?
23  A. Quay Cruise Agency.
24  Q. You didn't get any direct payment from the ship?
25  A. No.

1  Q. How did you know what to order in the way of
2  medications and supplies?
3  A. I would be told by the medical facility on the
4  ship.
5  Q. Did you ever arrange for any ambulance service for
6  any Norwegian Cruise Lines passengers?
7  A. Yes.
8  Q. And that would result again by the contact -- a
9  contact to you from the ship asking that you make those
10 arrangements?
11 A. Correct.
12 Q. Did you have any prior contacts with ambulance
13 services so that if you needed an ambulance you would have
14 that sort of set up ahead of time?
15 A. No.
16 Q. During -- how long did you work at this position
17 we've been talking about today where you were involved with
18 Norwegian lines cruise ships?
19 A. I'm sorry?
20 Q. How long did you hold the position we've been
21 talking about today where you were involved as an agent with
22 Norwegian lines?
23 A. From May 2002 till March of 2004.
24 Q. Can you give me some idea of how many times you
25 were called upon -- and I'm just looking for an estimate.

1  hospital, I would be requested to follow up with the
2  hospital as far as what the status was of a patient.
3      Q.  So, in other words, if I can give you a scenario
4  and tell me whether I have it accurately.
5      The Norwegian Cruise Line ship might contact you
6  and say there's a passenger or an employee who is ill and
7  ask you to aid in arranging for medical services?
8      Did I get that right?
9      A.  Yes.
10     Q.  And as part of that you had a telephone number
11 already in your cell phone to contact an ambulance service
12 if you needed ambulance transportation for the passenger or
13 the employee from the ship to the hospital; is that right?
14     A.  Can you repeat that?
15     Q.  Would you read that back to him?
16              (Whereupon the reporter read
17              back the record as requested.)
18     THE WITNESS:  Can you rephrase that?
19     MR. BURKE:  Q.  You don't understand that
20 question?
21     A.  It's fairly drawn out.  I don't want to say yes or
22 no.
23     Q.  Do you have a college education?
24     A.  Yes.
25     Q.  Do you have a degree?

1  correct?

2  A. Correct.

3  Q. And do you recall doing that before -- during the

4  do you recall doing that during the time you were working at

5  this position?

6  A. Yes.

7  Q. And can you give me an estimate of how many times

8  you might have done that?

9  A. Would have been the same, 20, 50 times. I really

10 don't know.

11 Q. Is that a fair estimate somewhere between 20 and 50

12 times?

13 A. That might be, yeah, 20 to 50.

14 Q. Had there ever been an occasion -- I'm not talking

15 about Mrs. Gast in particular -- when you were contacted by

16 someone on the ship to help locate a passenger who had not

17 made it back to the ship when expected?

18 A. I'm sorry?

19 Q. Would you read that back to him, please.

20           (Whereupon the reporter read

21           back the record as requested.)

22 THE WITNESS: Yes.

23 MR. BURKE: Q. And can you give an estimate

24 within that two-year period you were working on that job an

25 estimate of approximately how many times that kind of

```
 1   request was made to you?
 2        A.  Between 10 and 30.
 3        Q.  Had you ever had a request during that two-year
 4   period not from the ship but from some other organization or
 5   person asking you or tasking you with trying to find a
 6   missing passenger?
 7        A.  I'm sorry, repeat that again?
 8        Q.  Yeah.  We are talking about requests from the ship
 9   about helping to find a missing passenger.
10            Now, I want to talk about any request that would
11   have come from any other source other than the ship,
12   requests from anyone else?
13        A.  Yes.
14        Q.  And who would that have been?
15        A.  The cruise line.
16        Q.  The ship?
17        A.  The -- the head office, the cruise line not
18   necessarily the cruise ship.
19        Q.  All right.  I gotcha.  All right.
20            How about your own company, were you ever contacted
21   to your knowledge during those two years and asked by
22   someone for the company you work for to aid in helping to
23   find a passenger they understood was missing?
24        A.  Yes.
25        Q.  And how many times roughly or approximately did
```

```
 1  through once you were tasked with helping find a missing
 2  passenger?
 3       A.   First, I would call customs.
 4       Q.   Okay.  Stop, if you would for a minute.
 5            Why call customs as far as trying to locate a
 6  missing passenger?
 7       A.   Well, I call customs because they're on a foreign
 8  ship.  And technically when they get off the ship, it's like
 9  coming into the country -- from my understanding it's like
10  from coming out of the country -- I mean, coming into the
11  country from a foreign country.
12       Q.   So that contact wasn't to help find the passenger;
13  that was just to alert the federal authorities there might
14  have been a Jones Act violation?
15       A.   Yes.  That was part of my --
16       Q.   Would that have been the first call that you make?
17       A.   That would have been the first call.
18       Q.   Then what was next in your procedure?
19       A.   Then I would check hospitals to see if anybody was
20  admitted.
21       Q.   Let's talk about the Hilo Harbor.  Was there more
22  than one medical facility to check to see if they've
23  admitted someone?
24       A.   As far as I know the only medical facility I know
25  is Hilo Hospital.
```

```
 1       A.   I don't remember.
 2       Q.   All right.  What would you next do after calling
 3  the Hilo Hospital if we're talking about that harbor?
 4       A.   Next I would contact rental car companies, hotels.
 5       Q.   Let's stop there.
 6            In this particular case do you recall contacting
 7  any rental companies at all?
 8       A.   I don't remember.
 9       Q.   All right.  Do you believe based on the fact that
10  you were attempting to locate Mrs. Gast -- we know that
11  much -- and you had this in your normal procedure, that it's
12  more likely than not that you did contact rental car
13  companies?
14       A.   I'm not sure.  I might have called them.  I might
15  not have called them.
16       Q.   Well, when you were going through your procedure of
17  trying to find people, did you take that responsibility
18  seriously?
19       A.   Yes.
20       Q.   In taking it seriously did you try to do all these
21  steps you had in your mind to try to do?
22       A.   I can't remember what I did that day.
23       Q.   That's not my question.
24            My question is if you were taking your job
25  seriously, and you had this checklist already set up to do
```