```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF HAWAII
 3                     ---oOo---
 4
 5   JOHN GAST, individually, and as    CIVIL NO.
     Special Administrator of the        CV 0400079
 6   Estate of JACQUELINE GAST,          DAE BMK
     And as Guardian Ad Litem for
 7   His minor child,
     AMANDA RENEE GAST,
 8   and BROOKE ASHLEY GAST,
 9         Plaintiffs,
10   v
11   SUNG KI KWAK, dba SHIN.
     JIN HAWAII TRAVEL & TOUR,
12   A Hawaii Sole Proprietorship;
     CYNTHIA HATHAWAY,
13
           Defendants.
14
     _____/
15
16      REPORTER'S TRANSCRIPT OF THE PROCEEDINGS
17
18       DEPOSITION OF MATTHEW JAMES LEWIS
19          TUESDAY, SEPTEMBER 20, 2005
20   ATKINSON-BAKER
     COURT REPORTERS
21   180 Montgomery Street, Suite 800
     San Francisco, CA  94104-4266
22   800-288-3376
23
24   FILE NO.: 9F07261
25     Reported By:    Donna Covington, CSR #8507
```

```
 1            MATTHEW JAMES LEWIS,
 2       Having been duly sworn by the Reporter,
 3  testified as follows:
 4
 5  EXAMINATION BY MR. O'CONNOR
 6            Q.  Could you please state your
 7  name?
 8            A.  My name is Matthew James Lewis.
 9            Q.  Have you been deposed before?
10            A.  No.
11            Q.  Let me go over the ground rules
12  of a deposition.  We're here today to take
13  your deposition in a case entitled John Gast,
14  et al. versus Sun Quay Kwok, et al., in the
15  U.S. District Court, the District of Hawaii.
16  and you've been sworn to tell the truth as if
17  you're in a court of law.
18            Do you understand that?
19            A.  Yes.
20            Q.  Okay.  You're testifying today
21  as a representative of Norwegian Cruise
22  Lines.  And I want to make sure that we have
23  a clear record.  Only one of us can speak at
24  a time.
25            Do you understand that?
```

```
 1              BY MR. O'CONNOR:
 2          Q.   When he did not get on the
 3   vessel.
 4          A.   Normally, no.
 5          Q.   All right.  What was it -- what
 6   is it about -- strike that.
 7              In this particular instance,
 8   Mr. Gast has indicated that he reported his
 9   wife missing to the ship at a certain point
10   in time.
11              Are there protocols that Norwegian
12   Cruise Lines has concerning the reporting of
13   a passenger missing by their traveling
14   companion?
15          A.   Normally the vessel would
16   contact the Port Agent.
17          Q.   Well, if she has been reported
18   missing let's say in the morning to the Hotel
19   Department, what would the protocol be in
20   terms of what the Hotel Department would do
21   with that information?
22          A.   They would check the Fidelio
23   system to determine whether or not the
24   passenger was on board.
25          Q.   Would the ship be searched?
```

1 that right?
2     A.  That is correct.
3     Q.  And then in order to not violate
4 the Jones Act they would go down to Fanning
5 for the international leg of the trip?
6     A.  That is correct.
7     Q.  Okay.  The protocol of reporting
8 to the Ship Agent, was that a standing order,
9 or what type of protocol was that?
10    A.  If a passenger did not return to
11 the vessel, the ship would notify the Port
12 Agent.
13    Q.  Okay.  And is that a written
14 policy?
15    A.  It's not a written policy.
16    Q.  Okay.  Would anyone aboard the
17 vessel contact authorities ashore?
18    A.  The standard procedure would be,
19 however, it's not written, is to contact the
20 Port Agent.
21    Q.  Would the Port Agent receive --
22 strike that.
23    Is there anything in the procedure
24 about the information that should be given to
25 the Agent?

```
 1        A.   Not that I'm aware.
 2        Q.   Would the Agent be instructed to
 3   search for the missing passenger?
 4        A.   That may be something the Agent
 5   does.
 6        Q.   Well --
 7        A.   Are you referring to physically?
 8        Q.   Well, I'm just wondering what
 9   the parameters are of what the Agent is
10   expected to do.
11        A.   On the pier, wait for the
12   passenger to return.  If the passenger
13   doesn't return, then the agent would normally
14   notify the authorities.
15        Q.   Is there a time that the Agent
16   would wait, amount of time, for the passenger
17   to return?
18        A.   No.  Not to my knowledge, no.
19        Q.   Okay.  And is it Norwegian
20   Cruise Lines' policy that the ship is not to
21   contact authorities, proper authorities shore
22   side?
23        A.   No.
24        Q.   Is there any policy that the
25   ship is to contact the authorities shore side
```

```
 1          A.  It can vary.  It could be the
 2   Captain.  It could be the Staff Captain.  It
 3   could be the Security Officer.
 4          Q.  In this particular case,
 5   Norwegian Cruise Lines did not -- well,
 6   strike that.
 7          Did Norwegian Cruise Lines make a
 8   report to the Hawaii Police Department
 9   concerning Mrs. Gast being missing?
10          A.  I'm not sure if the vessel did.
11   That would be something the Port Agent would
12   do.
13          Q.  Do you know when that report --
14   so if it happened, it happened through the
15   Port Agent?
16          A.  That's correct.
17          Q.  And do you know when the Port
18   Agent got a hold of the Hawaii Police
19   Department and made a report?
20          A.  No, I do not.
21          Q.  It says here on what we've
22   marked as Exhibit C in the second full
23   paragraph, (Reading)
24                  "I have spoken to her
25                  husband, John Gast, who
```

1   him not to answer because it contains
2   privileged information.  That's all.  I'm
3   trying to help.
4          BY MR. O'CONNOR:
5          Q.  Okay.  Anything that you knew
6   other than speaking to Mr. Portnoy about this
7   case.
8          A.  No.
9          Q.  You don't know whether that
10  happened or not?
11         A.  I'm not sure that the
12  conversation of liaising between this
13  gentleman.
14         Q.  Well, let me ask you this:  If
15  the police in Hilo are conducting a search
16  like that for one of your passengers, who
17  would be the contact person for Norwegian
18  Cruise Lines for such a search?
19         A.  The Port Agent.
20         Q.  Okay.  And have you had
21  situations in Hawaii where you had
22  authorities conduct a search such as this?
23         A.  I can't recall in Hawaii.
24         Q.  Have you had situations in other
25  jurisdictions where you've had authorities

1  A.  Yes, sir.
2  Q.  And --
3  MR. PORTNOY:  Well, hold on.
4  BY MR. O'CONNOR:
5  Q.  Were you aware that when the
6  Wind left port Mr. Tabiscola went on the
7  Wind?
8  A.  No.
9  Q.  So you were under the impression
10 that Mr. Tabiscola remained in Hilo?
11 A.  I don't track their schedules.
12 Q.  Well, you indicated to me
13 earlier that the policy of Norwegian Cruise
14 Lines was to have the Ship Agent coordinate
15 the shore side search; is that right?
16 A.  That's correct.
17 Q.  Who was the person at Quay
18 Cruises that was coordinating the shore side
19 search for Mrs. Gast?
20 A.  This particular incident, the
21 only person that I dealt with was Anne
22 Stephens.
23 Q.  Okay.  And do you know where
24 Anne's office is?
25 MR. PORTNOY:  Now or then?  I'm

1  AKAL Security Supervisor hand a piece of
2  paper to the police officer, does that follow
3  the Norwegian Cruise Lines' procedure that
4  you've set up concerning the Port Agent being
5  involved in coordinating?
6          A.   The procedure is the Port Agent
7  is the focal point of coordination.
8          Q.   Okay.  So you don't expect,
9  then, for information to be passing through
10 AKAL Security to the police?
11         A.   It can occur.
12         Q.   Okay.  Depending on who's
13 available?
14         A.   It would depend upon the
15 evaluation of actually what's happening on
16 the pier.
17         Q.   Okay.  If information comes into
18 AKAL about a passenger being missing on a
19 tour, was there any policy, protocol
20 concerning how that information would be
21 forwarded on to the ship?
22         A.   AKAL's responsibility is
23 security.
24         Q.   Okay.  To keep people away from
25 the ship, correct?

1  ship's Agent failed to do anything he was
2  asked to do?
3          MR. PORTNOY:  Well, if you have
4  information or you've reached conclusions or
5  any information from persons other than
6  counsel, please answer the question.  But if
7  it's only things that you and I may have
8  discussed, you're not supposed to answer
9  that.
10         THE WITNESS:  I don't -- I do not
11 have any additional information.
12         BY MR. DAVIS:
13         Q.  Right.  And my question is to
14 you as a 30(b)(6) representative of Norwegian
15 Cruise Lines.
16         Is it the Cruise Lines' position
17 that the Ship Agent failed to do anything he
18 was asked or instructed to do?
19         MR. PORTNOY:  Well, that's a totally
20 improper question.  He's not been designated
21 for that.  I'm going to instruct him not to
22 answer.  He's not a 30(b)(6) representative
23 for that question nor answer.
24         MR. DAVIS:  He is a 30(b)(6)
25 deposition for the security staff.  And from

1  that perspective, as a representative, this
2  is the deposition of a corporation.
3          MR. PORTNOY:  Sorry.  You're
4  absolutely wrong.  None of the areas under
5  30(b)(6) ask for opinion or other testimony
6  regarding the conduct of anyone other than --
7  in fact, no one.  He can testify to facts and
8  that's all I'm going to permit him to.  If
9  you wanted to do a 30(b)(6) asking what
10 witnesses are we going to put forward
11 allegedly to blame other people, we would
12 have done that.  So I'm instructing him not
13 to answer.
14         MR. BURKE:  I also want to object
15 because I think it's asking for some sort of
16 legal conclusion.  And I don't believe this
17 witness is competent to provide a legal
18 conclusion.
19         BY MR. DAVIS:
20     Q.  All right.  Let me ask one other
21 question, then.  And my question is to you,
22 again, as a 30(b)(6) representative to
23 testify about the security, from the security
24 standpoint, does NCI believe that the ship's
25 Agent did anything wrong in this particular

```
 1  case?
 2          MR. PORTNOY:  Again, it's not a
 3  30(b)(6) --
 4          MR. DAVIS:  Okay.  Just instruct
 5  him.  I want to get my record.
 6          MR. PORTNOY:  That's fine.  Okay.
 7  As you've asked the question I'm instructing
 8  him not to answer as a 30(b)(6)
 9  representative of the company.
10          BY MR. DAVIS:
11          Q.  You indicated that you received
12  a call about midnight on October 14th; is
13  that correct?
14          A.  Yes, that is correct.
15          Q.  And you were home; is that
16  right?
17          A.  Yes, I was home.
18          Q.  And do you know who was the call
19  from?  Do you recall?
20          A.  The call was from the Norwegian
21  Star.
22          Q.  Right.  Do you know who on the
23  Norwegian Star it was from?
24          A.  I believe it was the Security
25  Officer.
```

1 But why were you referencing her?
2      In other words, why did you think it
3 was appropriate to have the Star advise the
4 Honolulu Port Agent?
5      A.  I can't recall exactly why.
6      Q.  Did you believe the port agency
7 in Honolulu had a responsibility in this
8 matter?
9      A.  I believe as the head office, as
10 the Quay Cruise head office, that they did,
11 yes.
12      Q.  Okay.  And can you describe for
13 me your understanding back then of the nature
14 of the port agency's responsibility to the
15 cruise line?
16      A.  Well, the Port Agent is hired to
17 coordinate these efforts, missing persons
18 efforts.  I just wanted to make sure that the
19 main office, the woman that I've dealt with,
20 I'm not fully aware of the other folks that
21 were out there other than reading the e-mail,
22 was advised.
23      Q.  So, in other words, it was your
24 understanding as Chief of Security for the
25 corporation that one of the responsibilities