**STEPHEN B. KEMBLE, M.D.**
**PSYCHIATRIC ASSOCIATES, LTD.**

ONE KAPIOLANI BUILDING, SUITE 402
600 KAPIOLANI BOULEVARD
HONOLULU, HI 96813
TELEPHONE (808) 537-2665
FAX (808) 524-3747

March 20, 2005

Dennis E.W. O'Connor, Jr., Esq.
733 Bishop Street, 24th Floor
Honolulu, HI 96813-4070

Re:   Gast v. Sung Ki Kwak, et al., Civil No. CV04-00079 DAE/BMK

Dear Mr. O'Connor,

You have asked for my opinion concerning possible psychiatric factors affecting Mrs. Gast's death on October 14, 2002. I have reviewed the following documents you sent me concerning this case:

1. Complaint filed 2/3/04
2. Expert Report of Plaintiff's Expert, Dr. Elizabeth Tam, M.D.
3. Records from Hilo Medical Center
4. Records from Hawaii County Police Department
5. Gulf Coast Hospital
6. Acme Communications
7. Tampa Pathology Laboratory
8. DNA Connection
9. Akal Security
10. State of Hawaii, Dept. of Transportation, Harbors Division
11. Lee Memorial Park Funeral Home
12. Raymond A. Johnson, M.D. (Mrs. Gast's treating psychiatrist)
13. Lee Memorial Healh Systems
14. Joseph Salaz, M.D. (Mrs. Gast's primary care physician)
15. Depositions of:
    Cynthia Hathaway, taken 8/30/04
    Cynthia Hathaway, taken 11/12/04
    Taures Garcia (Volcanos NP Maintenance Worker)
    John Gast
    Amanda Renee Gast
    Brooke Ashely Gast
    Raymond Johnson, M.D.
    Sharon Weiler
    Jamie Kailiawa

**EXHIBIT 3**

MAR ~8 2005

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE TWO

      Larry Ammasi
      Martha Woods
16. Defendant NCL (Bahama) Limited's Response to Plaintiff's First Request for Production of Documents dated 11/10/04.
17. Plaintiff's Documents
18. National Park Documents
19. Interrogatory Responses by Plaintiffs

Summary of records from Mrs. Gast's physicians:

Mrs. Gast's medical records from her psychiatrist, Dr. Raymond Johnson, her primary care physician, Dr. Joseph Salaz, and her hospital records from Lee Memorial Hospital, indicate that she had chronic problems with anxiety and depression and evidence of emotional instability going back many years. There are references to her mother having an affective disorder or bipolar disorder, and to a history of abuse in childhood. In about 1993, she was hospitalized in a psychiatric hospital, Charter Glade Hospital in Fort Meyers, FL, apparently for a suicide attempt. She reported a history of cocaine abuse many years ago, and episodic alcohol abuse up to at least the 1990's, although apparently that was not much of an issue in the last few years before her death. She had been prescribed Paxil and Zoloft at times during the 1990's. She was seeing Stephen McGruder, MSW, for psychotherapy in the late 1990's, and he apparently referred her to a psychiatrist, Dr. Raymond Johnson, MD, for medication management for symptoms suggestive of Bipolar Disorder and Borderline Personality Disorder.

Dr. Johnson saw Mrs. Gast for the first time on February 18, 2000. His notes are computer generated, and he often carries information forward from note to note which clearly has changed, based on other parts of the notes. However, by looking for new and changed information, it is generally possible to determine which parts of the notes are current information. Also, it is clear from Dr. Johnson's notes and from his deposition that he considers himself to be a biologically oriented psychiatrist, who focuses almost exclusively on symptoms and medications. He attributes her symptoms to her illness(es), not to circumstances, and documents accordingly. Information about situational stressors is therefore very sketchy. After the first visit, he saw Mrs. Gast only for 15 minute medication management visits, and did not attempt to do psychotherapy. He saw her frequently at first, sometimes 2-3 times a week, but as she stabilized the frequency of visits dropped to once every 1-2 months. He last saw her on August 5, 2002, over 2 months before her death.

At her first visit with Dr. Johnson on Feb. 18, 2000, Mrs. Gast was anxious, apprehensive, and hypervigilant, with racing thoughts and episodic panic symptoms. She was noted not to be depressed or psychotic. She reported family and relationship problems, and marginal work performance. She gave a history of past alcohol and cocaine abuse, but no active substance

abuse. She had a psychiatric hospitalization 7 years earlier. She said her mother was bipolar. In a form she filled out prior to the first visit, she noted suicidal thoughts, without plan. She said she had a diagnosis of "Manic Depressive," and had been treated in the past with Paxil and Xanax as needed. Dr. Johnson diagnosed Bipolar Disorder, Mixed (296.63), and alcohol abuse (305.00). He prescribed Seroquel, an antipsychotic and anti-manic drug, which is also sedating and helps sleep. Four days later, she was anxious with panic symptoms, and reported dizzy spells, episodes of irritability and angry outbursts, fatigue, feelings of worthless, insomnia, and impaired concentration. She also reported arguments with family members and quit her job due to her symptoms. She reported worse insomnia on Seroquel, so it was switched to Risperdal. Over the next year or so, she was tried on multiple medications, including anti-psychotics (Risperdal, Zyprexa, and Geodon), a mood stabilizer (Tegretol), anti-anxiety drugs (Xanax, Gabitril, Klonopin), a sleeping medication (Trazodone), and an antidepressant (Paxil). She had trouble with side effects from all the anti-psychotics, but by June 2001, she was eventually stabilized on a regimen of standard doses of Paxil, Tegretol, Trazodone, and Klonopin, which is a reasonable drug regimen for someone with Bipolar Disorder, mixed type. A diagnosis of Borderline Personality Disorder was added on May 25, 2000, apparently after a discussion with her psychotherapist, Stephen McGruder. During her first year of treatment, most of the notes refer to somatic symptoms and medication side effects. On 2/28/01, she was noted to have anxiety and worry, back pain, reduced interest, dysphoria, distractibility, impaired concentration, identity disturbance, impulsive spending, low self-esteem, negative thoughts, rejection sensitivity, suicidal thoughts and thoughts of being dead, and word finding difficulties. After the last antipsychotic (Geodon) was stopped in June 2001, agitation, suicidal ideation, and physical symptoms subsided. In December 2001, she hurt her back and was treated with a short course of prednisone, an anti-anflammatory hormone well known to cause emotional instability. In her case, it was associated with more distress, including mood swings, suicidal thoughts, negative thoughts, anxiety, and worry. In January, she was noted to have work and family problems. In May 2002, she was reported to have quit work and had arguments with family, including verbal aggression. At her last visit on August 5, 2002, she was noted to have discussed "relationship/family problems" and "medical problems", and her GAF, which had ranged from 45 to 60, was rated at 60.

Records from her primary care physician, Dr. Joseph Salaz, note treatment for mild hypertension and recurrent back pain. She was also noted to have "anxiety and depression due to domestic problems," in addition to Bipolar Disorder. She was treated with Hyzaar and Atacand for BP (with pretty good control), Lipitor for hyperlipidemia, and for back pain she received muscle relaxers and Ultracet. On Sept. 9, 2002, she was treated by paramedics at a football game because of numbness in her hands and feet, but apparently was able to go home that evening. She called Dr. Salaz' office the next day, reporting inability to eat or drink and weakness, and asking what to do. She apparently also received a single prescription for Actiq lozenges 400 mcg, which is a fairly potent short acting opiate pain killer, on 10/3/02, about 10 days before leaving for her trip to Hawaii. She reportedly smoked a pack to 1½ packs cigarettes per day, but had no history

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE FOUR

of pulmonary disease, asthma, or cardiac problems, other than her hypertension. She had no history of seizures or syncope, but apparently sometimes got dizzy or numb due to anxiety.

<u>Depositions of John Gast (husband), Amanda Gast (daughter, age 13 at time of mother's death), and Brooke Gast (daughter, age 22 at time of mother's death):</u>

Mr. Gast was married to Jackie Gast for about 23 years. He said his wife stopped working as a real estate agent in 1999. He knew she had a diagnosis of Bipolar Disorder, and could be anxious at times, but says he could not recall her ever threatening suicide or episodes of extreme anger or throwing things during arguments. He says they did argue occasionally, but not often. He denied any kind of argument or unusual behavior on the part of his wife on the morning of 10/14/02, before he left her in their cabin on the ship to go on a helicopter tour. He says she ate a Danish roll for breakfast with him, and went back to bed before he left.

Amanda and Brooke both denied much conflict in the family, and could not recall episodes of agitation, extreme anger, or throwing things during arguments. They could not recall her becoming confused or disoriented. They both said she had episodes of shakiness and anxiety and depressed moods, but never heard her threaten suicide. They said they never saw her drunk.

<u>Documentation of events of October 14, 2002:</u>

Ship logs document that Mrs. Gast left the ship at 7:44 AM on 10:14, and never returned. She had her picture taken while disembarking, and was smiling at the time. Ship video monitors showed her in the elevator just prior to disembarking, and she was chatting with other guests and appeared to be in a happy mood.

The most detailed information about the date of Mrs. Gast's death was from Cynthia Hathaway, the tour guide who took her to see the volcano. Ms. Hathaway was an employee of Shin Jin Hawaii Travel and Tour, and at 7:30 AM on 10/14/02 she waiting by her 12 person van, soliciting passengers debarking from the cruise ship for a tour of the volcano. Mrs. Gast approached her and asked where she was going and how much it cost. Ms. Hathaway apparently informed her they would be visiting the active lava flow, that there were 2 short hikes to the lava viewing areas, and that if Mrs. Gast did not want to hike out to see the lava, she could stay in a shaded pavilion and wait for the group. Mrs. Gast seemed to be ambivalent about joining the tour, mentioning that her husband had left her alone for the day. She then left, and several minutes later, as Ms. Hathaway was getting ready to leave with 11 other passengers, Mrs. Gast returned and asked at the last minute if she could join the tour. Ms. Hathaway says she reviewed the dangers of the active lava flow and appropriate safety precautions with the tour group as they were leaving Hilo, and again as they approached the lava viewing area. They also stopped at a Hawaii Volcanoes NP visitor center before going to see the lava, and each passenger was given a brochure about the volcano, which also stated dangers and safety precautions. In the van, Mrs.

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE FIVE

Gast asked if she could smoke, and was told not in the van. When they arrived at the end of the Chain of Craters Road at 10:30 AM, Ms. Hathaway pointed out the rest rooms and the shaded pavilion by the turn around loop at the end of the road, and instructed the group to meet at that pavilion at 11:00, so they could make it back to the ship by 12:15 or 12:30, for a 1:00 PM departure. The passengers got off the van, and she recalls Mrs. Gast immediately lighting a cigarette. Ms. Hathaway then drove the van back along the road to where she could park, and returned to join the group. Several of them had hiked on ahead along the marked trails to the lava viewing area, and one elderly couple had decided to stay in the pavilion and not hike on the lava field. Mrs. Gast was lagging behind the other hikers with 3 others, and Ms. Hathaway joined her while she was still on the paved road, before reaching the lava field. Mrs. Gast was walking slowly, chain-smoking. She seemed "definitely less motivated than the others to get there." Ms. Hathaway accompanied Mrs. Gast about 30 feet onto the lava, when Mrs. Gast stopped and said she did not want to go farther. Mrs. Hathaway told her she wanted to catch up with the others, and instructed Mrs. Gast to return to the pavilion, which they could still see, and wait for the rest of the group. Mrs. Hathaway recalls the weather as being clear with good visibility, and it was not excessively hot where they were standing near the edge of the flow. Mrs. Gast headed toward the pavilion, and Ms. Hathaway turned to run after the rest of the group out on the lava flow. That was the last time she saw Mrs. Gast. When Ms. Hathaway returned with the rest of the group at 11:00 AM, they immediately determined that one of the group was missing, and that it was the woman later identified as Jacqueline Gast. (No log was taken of the tour participants, so none of them knew Mrs. Gast's name.) Some of the others recalled Mrs. Gast saying, "My husband always tells me I can never do anything right." Ms. Hathaway and others in the group searched the area of the pavilion and the first part of the hiking trails for 30 minutes without success. Ms. Hathaway also notified the only NP employee in the area, who turned out to be Taures Garcia, a park maintenance worker, that she was missing a passenger and to watch for her. Ms. Hathaway says that just before she left, she clearly recalls telling Mr. Garcia that he needed to contact the other rangers and initiate a search, as she had to get the other passengers back to the ship. Mr. Garcia recalls only her earlier request to "keep an eye out" for someone who had missed their tour, and did not initiate a search. Ms. Hathaway and the rest of the tour group left the area at about 11:30 AM.

Mr. Larry Ammasi was a tour driver for another company, Kai Tours, who was at the lava viewing site with his own tour at the same time as Ms. Hathaway's tour which included Mrs. Gast. As he was getting his group together to leave, a woman fitting Mrs. Gast's description approached him with an elderly couple from his tour, and they asked if she (Mrs. Gast) could get a ride back with his tour. Then Mrs. Gast herself made the same request, saying she wanted to get back as soon as possible because she had not informed her husband that she was going on a tour. She told him that coming on the tour had been a mistake. He asked her if she were having any kind of a health problem, and she said, no, she was fine, she just wished she wasn't there and wanted to get back to the ship. At that point, she did not seem agitated or distressed, and she had

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE SIX

been talking in a relaxed way with the elderly couple as they approached him. He told her he could not give her a ride because of liability issues, and she needed to wait for her own tour, which should be leaving in 10 to 15 minutes. Mrs. Gast offered him cash to take her back, which he declined. He also told her that her own tour would probably get back to the ship before his, since he planned to make a couple of stops on the way back. He then left with his tour group. On the way back, the elderly couple with whom she had been talking said she had been asking all the taxi drivers in the area for a ride back, and when she could not find anyone who would take her, she then approached them and asked to talk to their tour driver. Mr. Ammasi and his group were apparently the last to see Mrs. Gast alive.

National Park documents indicate that Mrs. Gast's body was found at about 6:30 AM by a visitor who had hiked inland from the kiosk area along the edge of the flow. She was about ½ mile inland from the road, away from any trail. Her body was lying supine on a recent flow, 20 yards from the edge of the flow, in an area that had hardened on the surface, but had hot lava about 1-2 feet below the surface. There was an active flow with surface lava a little way to the north of the body. She was fully clothed, wearing her jewelry, and had her purse on her chest, a pack of cigarettes by her side, and half a cigarette in her hand on her chest. She was barefoot, and one of her sandals was about 12 feet away. Her back and feet were badly burned and there was extensive thermal damage to her body, but neither she nor her clothes or cigarettes had burst into flames. In her purse was a camera, which included family pictures, pictures from the boat, and the last 8 are mid-day pictures of the area around where her body was found, taken on 10/14. Her purse also contained a set of 4 pill containers for her daily medications. The "morning" container was empty, and the other three contained the pills she was to have taken at 12-1 PM, at dinner time, and at bedtime, all of which contained pills. Weather logs indicate clear weather with light wind and good visibility on October 14. The area where her body was found was near vegetation and susceptible to methane gas pockets and explosions.

The autopsy report indicates extensive thermal damage to her back and feet, but no soot in the airways or mucosal edema in her lungs, and no respiratory obstruction. The heart showed thermal damage, but no evidence of a heart attack, and a toxicology screen was negative. The cause of death was listed as "Thermal burns," with "probable hyperthermia."

Dr. Elizabeth Tam from the Dept. of Medicine at University of Hawaii reviewed the medical records, National Park documents, and autopsy report. She comments that, "Her distance from the marked trail and her separation from her sandals suggest that her death was preceded by a period of disorientation. This is consistent with heat stroke that may have also been worsened by relative hypoxemia if she were exposed to eruptive gases in addition to her tobacco smoke. Her underlying bipolar disorder may also have been exacerbated by or contributed to the circumstances. She was also at increased risk for sudden death from cardiac arrhythmia/coronary ischemia and probably had little respiratory reserve if exposed to noxious gases." She listed

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE SEVEN

possible causes of death, in descending order of likelihood, as "heat stroke, cardiac arrhythmia, acute coronary ischemia, or acute bronchospasm as a consequence of combined pre-existing host and environmental factors."

Discussion:

There are a couple of discrepancies in the above documentation which need to be explained in order to establish a credible theory of what happened and why.

The first is the discrepancy between documentation by Dr. Johnson, and apparently by her psychotherapist, Mr. McGruder, of Mrs. Gast's disturbed emotional state, suicidal ideation, and family conflicts, and reports by her husband and daughters of only occasional conflicts and episodic depressed or anxious moods, but no severe agitation or suicide threats. Since Mrs. Gast was apparently no longer seeing Mr. McGruder in the last two years of her life, and Dr. Johnson had little interest in her psychosocial circumstances, we have very little information from her medical records about issues, precipitants, or problems in her personal life. One possibility is that Dr. Johnson is emphasizing symptoms and pathology to justify medication and managed care authorizations, whereas her family are minimizing problems because they are blaming the tour company and driver and others for her death. The other possibility is that Mrs. Gast in fact presented herself as more disturbed and suicidal to her mental health providers, and hid her distress from family because she was avoiding conflicts with them and/or did not want to burden them with her problems. There may well be elements of both. In any case, I would tend to assume that documentation of low self-esteem and frequent symptoms of anxiety, panic attacks, depressed moods, insomnia, low stress tolerance, and suicidal thoughts are probably valid. These symptoms were apparently intermittent, and had been less frequent in the months before her death than in previous years. Also, her psychotropic medication regimen had been stabilized in the last year of her life, which may have contributed to reduced frequency and severity of emotional and psychiatric symptoms. However, she remained emotionally fragile.

The second discrepancy concerns the apparent abrupt change in her mental status shortly before her death. She was apparently calm and in good humor on the morning of 10/14 when she left the boat. By the time the tour reached the lava field, she was becoming anxious about being away from the boat when her husband returned, and wanted to get back as soon as possible. By all accounts, she had no interest in seeing the lava, but was focused on finding a ride back as early as possible. She was behaving impatiently, but not in a confused or strange way, up to the point when her last hope of an early ride back was denied. Her behavior and intentions apparently changed abruptly after that. She went hiking a half mile inland, away from the trail, along side the lava, and far away from other people. She stopped to take pictures, then removed her shoes and walked out onto a still steaming lava field and lay down on her back with a cigarette in her hand. It seems most likely that she died soon thereafter, in the middle of the day on October 14.

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE EIGHT

Theories to explain Mrs. Gast's death:

Theories invoked by Dr. Tam and others assume a confusional state due to heat stroke, inhalation of volcanic fumes, or perhaps hypoxia, a cardiac arrhythmia, or hypoglycemia. She apparently took her normal morning medication, as the morning pill container was empty, so medication issues do not explain her behavior. However, I find it very difficult to imagine a confusional state due to heat, fumes, medications, or any other medical cause, which can explain the abrupt change in her behavior that began in the turn around loop on the road, away from the lava and fumes, and caused her to engage in sustained, purposeful behavior such as hiking ½ mile, taking pictures, removing her shoes, and smoking a cigarette while lying down on her back on a hot lava field.

However, I can think of a few variants on a psychiatric explanation for what happened, which would be consistent with all the known facts.

The first is that she was feeling fearful that her husband would be angry with her and guilty and ashamed of "never doing anything right." When she could not find an earlier ride back, she resolved in the parking lot to commit suicide. She then hiked away from the road, looking for a secluded spot where she would not be found, paused to take the pictures, and then deliberately walked out onto the hot lava field and lay down.

The second variant is that when she could not find an earlier ride, she became panicky and bolted from the parking lot, trying to get away from the other people. Once away from the road, she kept going until she calmed down enough to take pictures. Then she felt caught by the fact that she had undoubtedly missed her ride back, and fearful that her husband would be angry with her, or guilty and ashamed of her anxiety, leading to a decision to commit suicide by lying on the hot lava.

The third explanation would involve some kind of dissociative episode such as a fugue state. This would consist of an abrupt shift to an altered state of mind which was discrepant from her usual state, and which could include sustained purposeful actions that she would not do in her usual state of mind. Dissociative states are often associated with a history of early childhood abuse, particularly sexual abuse, and there is some indication that Mrs. Gast was a victim of childhood abuse. This theory would also involve deliberate suicidal behavior at the end, although it would have arisen from her altered state, and not just from the anxiety she was feeling about being late to return to the ship and to her husband. However, she did not have a history of dissociative states, making this explanation less likely.

GAST V. SUNG KI KWAK, ET. AL.
MARCH 20, 2005
PAGE NINE

All of these psychiatric explanations involve deliberate self-destructive behavior by Mrs. Gast, occurring over a relatively short time span, of the sort that could not have been prevented by any reasonably possible actions on the part of the tour driver, the National Park Service, the police, or the cruise ship company.

My conclusion is that the immediate cause of Mrs. Gast's death was most likely suicide, accomplished by deliberately isolating herself from the tour group and other people, lying down on hot lava, and waiting to die. A background and contributing cause was her Bipolar Disorder, and associated self-esteem problems and emotional instability and fragility.

Sincerely,

Stephen B. Kemble, M.D.
Psychiatrist