Gast report

**Michael H. Stone, M.D.**
Suite 114
225 Central Park West
New York City, New York 10024

Professor of
Clinical Psychiatry
Columbia College of
Physicians and Surgeons

Tel. (212) 758-2000
Fax. (212) 799-7165
Email mstonemd@aol.com

R. Michael Burke, AUSA
U.S. Department of Justice
District of Hawaii
PJKK Federal Building
300 Ala Moana Boulevard
Room 6-100
Honolulu, HI 96850

April 5th, 2005
In re: CV 04-00079 DAE BMK
Gast v Kwak et al

Dear Mr. Burke:

The following report concerns the above-captioned case and my opinions in connection with it; specifically, my responses to the statements and opinions expressed by the plaintiff's expert witness in the civil case referred to above. My opinions are based on the material submitted to me last month from your office. These opinions are expressed to a reasonable degree of medical probability.

**Areas of Expertise**

My clinical experience in psychiatry, including forensic psychiatry, and my authorship of approx. 200 papers and 10 books (as author or co-author) in the areas of personality disorder and symptom-disorders are outlined in my curriculum vitae, already submitted to your office.

**Medical Records Reviewed in Forming my Response**

In preparation for this report I reviewed the documents listed just below:
    Deposition of John Gast – January 24-25, 2005 [two volumes]
    Deposition of Amanda Gast – January 25, 2005
    Deposition of Brooke Gast – January 25, 2005
    Deposition of Dr Raymond Johnson, MD – January 25, 2005


EXHIBIT 6

Deposition of Cynthia Hathaway – August 30, 2004 [two volumes]
Folder of Miscellaneous Documents, including:
    Maps: Hilo Harbor
    NCL Star 10-14-2002 Log
    Supplementary Incident Report: J Kailiawa
    Supplementary Incident Report: Harbor Police
    Supplementary Incident Report: Larry Ammasi
    Supplementary Incident Report: Ian Birnie
    Supplementary Incident Report: Amelia Manera
    Administrative Determination: Gast Claim
    Gast Administrative Claims
    NPS Report
    TVL & Tour Initial Disclosure
    Hawaii Police Department Report
    Autopsy Report & Photographs
    E-Mail Messages
    Correspondence: US Department of Interior, etc
    Media
    Photographs (23 photographs of the deceased and the pertinent lava area
    Report of Queens Medical Center pharmacy operations manager, Selma Yamamoto

## Compensation Information

My fees per hour for my services are as follows:
    For review of materials, consultations, production of written reports: $275
    For appearance at deposition or in court to deliver testimony: $325

## Summary of Points Pertinent to the Case Relative to my Area of Expertise

*(a) Material bearing on the psychiatric diagnosis of the decedent*

The material re: diagnosis – available to me was the depositional record of Dr. Raymond Johnson, the psychopharmacologist who began treating Mrs. Gast in February of 2002. She presented at that time with shortness of breath, irritability, fatigue, insomnia and a decrease in her social ability (p 7 of deposition). In addition, Dr. Johnson noted an agitated depression, hypomania, moods that went up & down, racing thoughts, and crying spells (p 10). This constellation of symptoms led Dr. Johnson to entertain a diagnosis of *Bipolar disorder* (a variant of Manic-Depressive Illness). He also mentioned that there were conflicts with Mrs. Gast's daughter who was going to college (p 11), adding that Mrs. Gast had a tendency to resort to alcohol "as is common among bipolars" (p 13). In March of 2000 Dr. Johnson placed Mrs. Gast on a mood stabilizing medication; namely, carbamazepine [Tegretol®] because she was "angry and irritable" (p 18). Regarding her continuing to work as too stressful, he then

2

recommended that she stop working, which she apparently then did. Mrs. Gast was also seeing a therapist, Mr. McGruder MSW.

In May of 2000 Dr. Johnson added "Borderline Personality Disorder" [BPD] to his diagnostic impressions, and added to her medication regimen both paroxetine [Paxil®] and clonazepam [Klonopin®]: the former, for depression; the latter, to combat anxiety (p 29). Dr. Johnson commented that Mr. McGruder had already been seeing Mrs. Gast for several years and was more acquainted with her personality than he [Dr. Johnson] was (p 31). Dr. Johnson mentioned that she had a way of interacting with others so as to alienate them and that she experienced "low self-esteem" and "negative thoughts about herself" (p 35).

Dr. Johnson noted that in February of 2001 Mrs. Gast had suicidal thoughts. Around this time she had undergone a hysterectomy. She spoke of having "bad dreams" as well, but Dr. Johnson said such a symptom lay outside his area of competence, being a biologically oriented psychiatrist (p 38). In April of 2001 she was still having suicidal thoughts; Dr. Johnson switched one of her medications to ziprasidone [Geodon®] – which is one of the newer antipsychotic compounds that are also used in allaying the symptoms (viz., anxiety and irritability) seen in bipolar patients (p 41).

In May of 2001 she was seen twice in an emergency room because of panic attacks. These had been prompted apparently by the added stresses of a new house that she & her husband were building, her older child being at home, and an up-coming wedding (p 44). In conjunction with these stresses, her suicidal thoughts were becoming more severe (June 2001)(p 47).

Dr. Johnson thought Mrs. Gast was "a little worse" by May of 2002: her symptoms seemed worse and there was still some suicidal thinking (p 50). He mentions that she and one of her daughters were having a fight and that Mrs. Gast was throwing things (p 52). At that point Dr. Johnson recommended that she see a psychotherapist, though she did not pursue this advice. It seemed as if she had in the meantime discontinued seeing Mr. McGruder (p 63).

As to the cause of death of Mrs. Gast, Dr. Johnson did not think the medications played a role (p 64), and did not think her death was a suicide – given that in the time he knew her (2 years) she had not made suicide gestures (p 65). He did, however, acknowledge that some years before he knew her, when she was 36, she had been hospitalized for "self-injurious behavior" (the nature of which was not spelled out in the deposition, nor is it clear whether Dr. Johnson knew the details). He mentioned her having abused cocaine and alcohol in the past.

Sometimes Mrs. Gast would quit taking her medications and not see either Dr. Johnson or her therapist (Mr. McGruder) for long stretches of time, only to reappear later (p 90).

Despite his doubt about whether suicide intent played a role in her demise, Dr. Johnson acknowledged that bipolar illness, untreated, carries a heightened risk for suicide (p 93) and also for harming the marital relationship. He also stated she had a family history of mood disorders (p 100), though gave no details as to the nature of these apart form saying they "would be bipolar or major depression." Likewise, he said nothing about which family members might have been affected.

### (b) *Material from the Deposition of the Decedent's Husband, Mr. J Gast*

Mr. Gast asserted he did not know what medications his wife took (p 69), though he recalled that she took various pills three times a day. Further on, he disclaimed knowing she was taking 14 different medications (p 154). He was aware his wife could get overheated and then disoriented, as happened once during a football game in Florida where they lived (p 88), and then on another occasion by the side of a road in Fort Myers, Florida.

Mr. Gast was aware his wife was considered "manic depressive" (p 140), but did not think she was a "risky" type of person – as was stated by an old neighbor, Eddie Rosa, as quoted in the Fort Myers News-Press (p 143). That is, Mr. Gast did not agree that his wife took undue risks as were implied by the neighbor's comment.

He knew his wife was hospitalized once for a drinking problem, but had no understanding as to whether that were in any way connected with her manic-depression (p 163). But he did state that "when drunk, she got a little boisterous" – but that that was 4 years before the fatal incident (p 164).

Mr. Gast did not know whether his wife had discussed suicidal thoughts with either her psychopharmacologist, Dr.Johnson, or with her therapist, Mr. McGruder (p 181). Their daughter, Brooke Gast, however, was seen twice in the emergency ward in 2001 for suicidal thoughts – which she apparently "kept to herself," such that Mr. Gast was not at first aware of this (p 193).

A few months before her death, Mrs. Gast was re-started on paroxetine [Paxil®] following rage episodes in early 202.

*

[from the second booklet of depositional material from Mr. Gast, with different pagination]

Various questions were posed to Mr. Gast about whether he recalled the sorts of incidents alluded to in Dr.Johnson's deposition. The doctor mentioned, for example, "extreme irritability during early 2000" (p 41) which Mr. Gast says he does not recall. Then in April of that year, the doctor's mentioned "severe diminished energy and crying spells"[signs of depression] – which Mr. Gast does not recall. A month later, in May '00, Dr.Johnson spoke of her "verbal aggression" (p 42), which her husband denied experiencing. Mr. Gast likewise denied knowing that she had subsequently been diagnosed as having "borderline personality disorder" (p 43), nor of recalling the "arguments with family members" that were noted by the doctor. The husband denied any recall of any of the symptoms mentioned by Dr.Johnson (severe lack of interest in usual activities, agitation, feelings of desperation, severe anxiety, impaired concentration, negative thoughts, some suicidal thinking, thoughts of being dead)(pp 43-45). He acknowledges only her having had some "bad dreams," when he was asked about her "nightmares" – as mentioned in the doctor's notes of springtime 2001 (pp 45-46).

Mr. Gast denies that his wife had any difficulty finding words, or that she was exhibiting mood swings, as indicated in Dr. Johnson's notes of May 2001 – in contrast to which, he said his wife was "pretty stable at home all the time" (p 46, line 25).

As to the circumstances leading up to the fatal incident, Mr. Gast admitted that his wife was "not very good with directions" (p 104), though in statement to the police he talked of her getting lost easily and panicking when she got lost (p 104, ll 4-7); he replied "I don't know if panic" (p 104, l. 16).

Mr. Gast was at a loss how to explain why his wife chose to head up through the rocky terrain apart from the rest of the group shortly before 11AM on the morning of the fatal incident (p 112-113).

### (c) Material from Deposition of the Daughters

(Amanda Gast)

Amanda said she was not aware of her mother's diagnosis, not that her mother was depressed; merely recalling that her mother would speak of having a "bad day" (p 16); she did recall her mother saying that she (her mother) had a dread that she wouldn't live or was going to die – which Amanda figured was "what everyone said once in their life" (p 18).

(Brooke Gast)

She knew her mother was manic-depressive but "seemed better before the trip to Hawaii (p 10). She also knew her mother didn't want to go on the helicopter so she went instead onto the island [Brooke does not make clear how she knew this, given that neither daughter was accompanying the parents on their trip] (p 12). She denied that her mother or she fought or threw things (p 13), or had verbal fights (p 14). She denied knowing anything about her mother having had suicidal thoughts nor did she acknowledge knowing why her mother took the various pills that she took (p 36); she never saw her mother get ill from being in the sun (p 28) nor ever saw her mother get "overheated" (p 11).

### (d) Material from the Report of Selma Yamamoto, the pharmacy operations manager from Queens Medical Center

Ms Yamamoto listed seven medications, derived from the Convenient Care Medication Flow Sheet;namely, four psychotropic drugs:
- Carbamazepine [Tegretol®] for her bipolar disorder
- Clonazepam [Klonopin®] for anxiety
- Paroxetine [Paxil®] for depression
- Trazadone [Desyrel®] antidepressant often given for sleep, because of its soporific properties

and three medications for other purposes:
- AtorvastatinCa++ (Lipitor®] for hypercholesterolemia
- Conjugated estrogens [Premarin®] for post-hysterectomy

5

estrogen replacement
Losartin-K+//Hydrochlorothiazide [Hyzaar®] for hypertension

Ms Yamamoto felt Mrs. Gast was probably compliant about taking the medications and that the medications were given in appropriate amounts. Mrs. Gast had a Tegretol®-level drawn in March 2002 and the drug was found to be in the therapeutic range. Some medications were mentioned in the June 2002 medical records that were not mentioned in the material abstracted from her final days, and it was not clear whether she was actually taking those medications (Zanaflex® & Ultracet®). A sulfa allergy was mentioned in her records, and Ms Yamamoto speculated whether the sulfur dioxide from the lava flow might possibly have adversely affected Mrs. Gast's breathing via an allergic reaction.

The most curious entry in Ms Yamamoto's report concerns the note in Mrs. Gast's medical record (¶ 5) where mention is made of her having asked, approx. 12 days prior to her death (i.e., Oct 3rd) for a prescription for Actiq® [fentanyl citrate lozenges]. This compound is a powerful opioid agonist acting on the brain's opioid µ-receptors to foster profound analgesia and sedation. It is prescribed only for dying cancer patients with intractable pain – by way of alleviating that pain. As there is no evidence whatsoever that Mrs. Gast had cancer, let alone terminal cancer (though her body suffered many burn-related changes, the autopsy gave no indication at all of any cancer or other disease associated with intractable pain), one cannot help wondering what her motivation could have been to request such a drug. She apparently did experience back pain from arthritis (Yamamoto, ¶ 3) but, again, there is no record of her suffering pain from that source that could be reduced only by a drug as potent as Actiq®. We do not know why she asked for the drug, how she knew of it, and whether she ever was able to obtain any. The warnings written in the drug's brochure (the 2005 PDR, p 1122) make it clear that improper use of the drug can lead to respiratory death (from drug-induced hypoventilation). This in turn raises the question of whether suicide intent was behind her asking for this drug, and whether she had been making secret plans, unbeknownst to her family, to end her life. Not having access to Actiq®, she may have concluded that other means were still open to her, such as exposing herself to the intense heat of that day and that area where she died, augmenting the chances for a fatal result from overexposure, dehydration, fainting, and finally heart-failure. She *had* experienced at least two episodes of overexposure to the sun, as mentioned above (p 4), so she would have familiarity of the effects intense heat could have on her.

Clinic notes from her family doctor, Dr. Salaz (to whom she had been referred by Mr McGruder), who saw her beginning in February of 2000, allude to her having thoughts of harming herself [Bates 000016], mood swings, and "unrelenting crises" [Bates 000031 in Dr Johnson's deposition]. There is no mention of Actiq® in Dr. Salaz' notes and the lab reports; only of a milder analgesic for back pain.

\*

There was mention in the Media records [Bates stamp 00149] that "breathing lava haze can aggravate existing heart and lung conditions" – and in the Correspondence from the US Dep't of the Interior that she was found with a cigarette between her fingers,

6

when her body was located [Bates 00119]. It is unclear whether these observations point to any heightening of risk that may have actually contributed to her death.

## Discussion

There are a number of mysterious and unsolved aspects in the death of Mrs. Gast, related in large part to her having inexplicably wandered away from the tourist group of which she had earlier been a part on the final morning. Absent observers who witnessed her final movements and death, and owing to the necessarily imperfect nature of the autopsy because of the charring and other heat-effects upon the body, one cannot say with authenticity whether her death was (a) purely accidental (brought about by heat-stroke and fainting in the lava area), (b) accidental but related in some measure by the potentially aggravating effects of some of the medications she had been taking, (c) accidental but related in part to her bipolar condition – which is often associated with impulsive and risk-taking behavior, or (d) willed, and therefore a manifestation of a sudden or even planned suicidal impulse.

As to possibility (b), Tegretol®, for example, is associated with heightened *photosensitivity*, which can contribute to severe reactions to exposure to the sun ( Physician's Desk Reference, 59th edit., 2005, p 2379). This reaction is not mentioned by name -- by Ketter, Wang & Post (in A Schatzberg & C Nemeroff, editors: Textbook of Psychopharmacology, Washingotn DC: Amer Psychiatric Press, 2004, p590-592), though these authors do mention that the drug is associated more commonly with adverse side-effects than are other drugs used for bipolar conditions (p 590); they do mention "serious rashes" (p 591) – which are likely to be aggravated by exposure to the sun. In other respects, Tegretol® is not considered well accepted as a first-line agent in the treatmentof mood disorders, compared with lithium or valproic acid (S Stahl [2000] Essential Psychopharmacology.2nd Edit. NY: Cambridge Univ Press, p 269).

Dr. Johnson had prescribed ziprasidone [Geodon®] which is associated in some patients with impairment in the body's ability to reduce body temperature in situations of severe heat or dehydration. But it is not clear whether she was actually taking any of this medication at the time of her death.

As to possibility (c), there is considerable clinical evidence that bipolar patients, irrespective whether they have concomitant borderline personality disorder, act impulsively and are more likely than average persons to become involved in injuries or death from accidents or careless behaviors. Thus, "death by misadventure" is more likely in someone with her psychiatric condition than would be the case with normal persons. Accident proneness has been commented on as a feature encountered with more than normal frequency in bipolar persons (Bipolar Network News, volume 7, issue 1, page 10, Spring 2001). The fact that Mrs. Gast "got easily lost" (Mr. Gast, p 104) and could then have gotten overwhelmed with the heat and made poor decisions about how to extricate herself from her situation of being lost on the lava area – could constitute the kind of accident or misadventure that led to her death.

As to possibility (d), the risk for suicide in bipolar persons is greatly increased over that of the general population (F Goodwin & K Jamison [1990] Manic Depressive Illness. NY: Oxford Univ Press, p 493, 770 ff). These authors even draw attention to a striking increase in suicides in bipolar patients in May and in *October* (p

771). The lifetime risk for suicide in bipolar manic-depression (worse during depressed phases) approaches 10%— a 500% increase over the base population rate (MH Stone [1990] The Fate of Borderlines. NY: Guilford Press).

\*

What is striking about the reaction of the decedent's family, most especially of her husband, is their minimization of the abnormalities of her personality that Dr. Johnson refers to again and again in his notes. He speaks of rage outbursts, irritability, arguments with family members, crying spells, bouts of severe depression, and this from a psychiatrist not very sympathetic with the interpersonal/psychological aspects – as opposed to the biological aspects – of her condition. He does refer to the social worker-therapist, Mr McGruder, who knew Mrs Gast better and longer than he. It is most unfortunate that we do not have this therapist's records or deposition available, since his impressions and recollections could in all likelihood shed considerable light on just how Mrs. Gast actually behaved and related to the other members of the family.

Since it is in the interests of Mr. Gast to paint a normalized picture of his wife, now that there is an issue being litigated, we cannot say with accuracy whether he was truly as out of touch with her condition and behavior as he claims (how could he be blind to rage outbursts? – or not know anything about the long menu of medications that she, like many bipolar patients, was prescribed and presumably taking?). Dr. Johnson, in contrast, has no vested interest in maximizing the signs and symptoms of her illness, whereas Mr. Gast and the daughters have a motive to be less than forthright about the extent of her illness and of the impact it may well have exerted on the family members. Dr. Johnson mentions her mood swings, among other symptoms, and it is well known that living with bipolar persons, apart from the few who are perfectly controlled on a mood stabilizer, is to live on the roller-coaster. His reference to highs (including rage outbursts) and lows (including crying spells and periods of diminished activity, suicidal thoughts and the like) suggest a picture that departs significantly from one of harmony and placidity.

Another reason for wanting to know Mr. McGruder's experience with his former patient is that he apparently called her "borderline" – which generally implies a mixture of stormy interpersonal relations, impulsivity, moodiness, inordinate anger, and a tendency to manipulative suicidal acts (M Stone, 1980: The Borderline Syndromes. NY: McGraw Hill). Granted that many BPD patients lead smoother lives after they turn 30 or 35 (Stone 1990, op. cit.; M Zanarini et al: Prediction of the 10 year course of BPD. Am J Psychiatry, to be published), this is not always the case – particularly in the context of marital strife or the threat of divorce. Dr. Johnson spoke in general that "anybody who is continually argumentative and flies into rages, is always risking their marital relationship" (p 93 of his deposition). Mr. McGruder has potentially the most objective views about this aspect of her situation, so here again, it would be important to learn from him, if possible, his impressions about the state of the marital relationship. In a similar way, we do not know if the couple's decision to go separate ways: the husband by helicopter; the wife, into the tourist area on land – was a decision of no emotional significance, or was possibly an expression of some lack of harmony or togetherness in a couple that was having more disharmony than can be discerned from the assertions of the remaining spouse.

From the records available to me, the diagnosis of bipolar illness seems convincing. The diagnosis of BPD is a possibility, though one would like to know more. Either condition, let alone the two co-occurring, is associated with heightened risk for accidents – including accidental death, impulsive behaviors, and also suicide (a 3 to 9% lifetime risk in BPD: Stone 1990 op. cit.). Bipolar illness represents a genetic vulnerability that is always present throughout life – although can be more or can be less "active" depending on appropriateness of medical treatment, psychotherapy, and intercurrent life events. BPD, when it is an expression of bipolar tendency, can also be enduring. In other cases, it may diminish in intensity over time. In the case of Mrs Gast, if the diagnosis of BPD was accurate, it was likely set in motion by the underlying affective disorder (i.e., the bipolar illness). Even if it could be demonstrated that she was not suicidal at the time of her death, the (absent suicidality) accidental nature of her death was in my opinion, to a level of reasonable medical probability, not a pure accident (like being rear-ended by a drunk driver or being struck by a stone from the roof of a building), but rather an accident that was, as it were, waiting to happen – in a woman with several risk factors that raised the likelihood for such an occurrence: her bipolar illness, her tendency to get lost and to suffer ill effects from exposure to severe heat, the latter possibly aggravated by some of her medications.

Respectfully submitted,

*Michael H. Stone* md

Professor of Clinical Psychiatry: Columbia
Member: Amer. Academy of Psychiatry & the Law