# TABLE OF CONTENTS

I.    Introduction ..................................................................... 3

II.   Factual Background ........................................................... 4

III.  The Proffered Expert Testimony ........................................ 6

    A.    Stephen B. Kemble, M.D. ................................................ 6

    B.    Michael H. Stone, M.D. ................................................ 10

IV.   STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY .......... 12

    A.    Reliable and Based Upon Scientific Knowledge ................... 14

    B.    Helpful to the Trier of Fact ......................................... 15

V.    ARGUMENT ..................................................................... 16

    A.    Dr. Kemble's Testimony is Not Reliable Under Daubert ............ 16

        1.  Dr. Kemble's testimony is based on conjecture rather than facts ..... 16
        2.  Kemble's Testimony is not Based on Scientific Testimony ..... 20

    B.    Dr. Stone's Testimony Is Not reliable and Would Not Assist the Trier of Fact ........................................................ 21

        1.  Dr. Stone's Opinions are also based on conjecture ................... 21
        2.  Dr. Stone's Opinions Don't Meet the Standard for Scientific Knowledge ......................................................... 22
        3.  Dr. Stone's Testimony Would Not Aid the Trier of Fact ............ 22

    C.    All other references to suicide in relation to Mrs. Gast's death should be excluded ...................................................... 24

VI.   CONCLUSION ................................................................... 27

# TABLE OF AUTHORITIES

*Cases*

*Aga v. Hundahl,*
   78 Hawai'i 230, 891 P.2d 1022 (1995) ................................................................. 19

*Blanchard v. Eli Lilly & Co.,*
   207 F. Supp.2d 308 (D. Vt. 2002)............................................................... 15, 23

*Cabrera v. Cordis Corp.,*
   134 F.3d 1418 (9th Cir.1998) ......................................................................... 14, 20

*Campbell v. Metro. Prop. & Cas. Ins. Co.,*
   239 F.3d 179 (2d Cir.2001)............................................................................... 15

*Daubert v. Merrell Dow Pharmacueticals, Inc.,*
   509 U.S. 579 (1993).................................................................................... passim

*Diviero v. Uniroyal Goodrich Tire Co.,*
   114 F.3d 851(9th Cir.1997) ......................................................................... 14, 17

*Flores v. Johnson,*
   210 F.3d 456 (5th Cir. 2000)............................................................................... 20

*Goodwin v. Danek Medical, Inc.,*
   1999 WL 1117007 (D. Nev. 1999) ..................................................................... 15

*In re "Agent Orange" Prod. Liab, Litig.,*
   611 F.Supp. 1223 ............................................................................................... 17

*Kalamazoo River Study Group v. Rockwell Int'l Corp.,*
   171 F.3d 1065(6th Cir.1999) ............................................................................. 18

*Kennedy v. Collagen Corp.,*
   161 F.3d 1226 (9th Cir.1998) ......................................................................... 14, 15

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)..................................................................................... 13, 17

*Marathon Corp. v. Pitzner*,
   106 S.W.3d 724 (Tex. 2003)............................................................... 18, 19

*McLean v. 988011 Ontario Ltd.*,
   224 F.3d 797(6th Cir.2000) ...................................................... 18

*Mink Mart, Inc. v. Reliance Insurance Co.*,
   65 F.Supp.2d 176 (S.D.N.Y. 1993) ............................................ 17, 18

*State Department of Health v. Walker*,
   209 A.2d 555 (Md. 1965) ............................................................ 18

*U.S. v. Gwaltney*,
   790 F.2d 1378 (9th Cir.1986) ...................................................... 15

*United States v. Kelley*,
   6 F.Supp.2d 1168 (D. Kan. 1998)................................................. 13

*Rules*

Fed. R. Evid. 702................................................................13, 14, 15, 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN GAST, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE **ESTATE OF JACQUELINE GAST** AND AS GUARDIAN AD LITEM FOR HIS MINOR CHILD, **AMANDA RENEE GAST, AND BROOKE ASHLEY GAST**<br><br>PLAINTIFFS,<br><br>vs.<br><br>**SUNG KI KWAK,** DBA **SHIN JIN HAWAI`I TRAVEL & TOUR,** A HAWAI`I SOLE PROPRIETORSHIP; AND **CYNTHIA HATHAWAY,** AND **AKAL SECURITY, INC.,** A NEW MEXICO CORPORATION,<br><br>DEFENDANTS. | CIVIL NO. **04-00079 DAE-BMK** (WRONGFUL DEATH)<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |
| **SUNG KI KWAK,** DBA **SHIN JIN HAWAI`I TRAVEL & TOUR,** A HAWAI`I SOLE PROPRIETORSHIP; AND **CYNTHIA HATHAWAY,**<br><br>THIRD-PARTY PLAINTIFFS,<br><br>vs.<br><br>**NORWEGIAN CRUISE LINES, INC.** AND **NATIONAL PARK SERVICE,**<br><br>THIRD-PARTY DEFENDANTS | |

**NCL (BAHAMA) LIMITED**,

> COUNTERCLAIM PLAINTIFF,

vs.

**NATIONAL PARK SERVICE (USA)**,

> CROSS-CLAIM DEFENDANT

**NATIONAL PARK SERVICE (USA)**,

> COUNTERCLAIM PLAINTIFF,

vs.

**JOHN GAST**, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE **ESTATE OF JACQUELINE GAST** AND AS GUARDIAN AD LITEM FOR HIS MINOR CHILD, **AMANDA RENEE GAST**, AND **BROOKE ASHLEY GAST, SUNG KI KWAK**, DBA **SHIN JIN HAWAI`I TRAVEL & TOUR**, A HAWAI`I SOLE PROPRIETORSHIP; AND **CYNTHIA HATHAWAY**,

> COUNTERCLAIM DEFENDANTS.

**NATIONAL PARK SERVICE (USA)**,

> CROSS-CLAIM PLAINTIFF,

vs.

**NCL (BAHAMA) LIMITED**,

> CROSS-CLAIM DEFENDANT.

<u>**MEMORANDUM IN SUPPORT OF MOTION**</u>

## I.    INTRODUCTION

Jacqueline Gast was found dead from burns and exposure in a hazardous section of Hawaii Volcanoes National Park on October 15, 2004. The area in which her body was found was subject to methane gas pockets and explosions.

Mrs. Gast had traveled to the park as part of a tour operated by Defendants KWAK/SHIN JIN. The tour operator, Defendant CYNTHIA HATHAWAY, left the park at 11:30 a.m. without Mrs. Gast because she did not return to the tour van. While Hathaway claims she asked a park employee to initiate a search for Mrs. Gast, no search was undertaken. In fact, the area where Mrs. Gast was left was closed to visitors after the Shin Jin van departed, due to hazardous conditions.

There is no direct evidence concerning why Mrs. Gast did not return to the van at the agreed upon time (11:00 a.m.). There is no direct evidence of where Mrs. Gast was when the tour group was preparing to leave. There is no evidence sufficient to establish how or when she arrived at the area where her body was found. There is no direct or circumstantial evidence that would explain what happened between the time Mrs. Gast left the parking area and the time her body was found.

Two of the defendants in this case seek to offer imaginative testimony from psychiatrists to provide their opinion as to Mrs. Gast's actions and motivations in

3

her final hours. For the reasons set forth herein, those opinions as well as any other testimony tying the events at issue with suicide should be excluded under Rules 402, 403, and 702 of the Federal Rules of Civil Procedure, since they are based on speculation, do not satisfy the Daubert test, would not assist the trier of fact, and in fact are unfairly prejudicial.[1]

## II.    FACTUAL BACKGROUND

Mrs. Gast was driven to the volcano in a tour van operated by Defendant Cynthia Hathaway, an employee of Shin Jin Hawaii Travel and Tours. After walking a short way down the trail with Ms. Hathway, Mrs. Gast returned to the visitor turnaround area and attempted to get a ride back to the cruise ship by another tour bus operator and several taxicab drivers. All the drivers she spoke to declined her request. One driver she spoke to at approximately 10:30 a.m. described her as pleasant and in no apparent distress.

That was the last time Mrs. Gast was seen alive.

Conditions on and around the trails were intensely hot and extreme on the day of Mrs. Gast's disappearance. One visitor on the tour with Mrs. Gast reported that his wife's shoes melted onto her feet as they walked on the trail to see new

---

[1] Although Plaintiffs have challenged the expert testimony of various psychiatrists as to suicide under Daubert, the purpose of this motion is to limit the argument of counsel that Mrs. Gast died as a result of suicide.

lava. Visitors were allowed to go quite close to the flowing lava, and the trails were not well marked.

When Hathaway and the other members of the tour gathered to depart from the flow area at approximately 11:00 a.m., Mrs. Gast was not there. Hathaway looked around the pavilion area. Two passengers looked up the road for Mrs. Gast for several minutes. One attempted to go up the trail to the flow area to check for Mrs. Gast, but was stopped by park rangers, who told him that they were clearing the area because conditions were dangerous, following a methane explosion and the emission of sulphuric fumes.

Hathaway's van was the last to leave the flow area before it was closed due to dangerous conditions. On her way out she told the Park custodian to "keep an eye out" for the missing passenger.

When she failed to show up at her cabin, Mr. Gast became very concerned and reported it to the ship's security. He did not know where she had gone or whether she was some place on the ship. Although there were at least eleven passengers on board who were aware that Mrs. Gast was last seen at the Chain of Craters Road, the ship never bothered to make any announcement or investigate whether any of the passengers had any information about Mrs. Gast. No one made any attempt to search for Mrs. Gast at the volcano during daylight hours on October 14, 2002. It was not until early evening that the police were called to

come to the port and investigate.  Hours later, as the sun was setting, appropriate authorities came to the realization that Mrs. Gast was the person left at the volcano and that she had not returned.  By that time it was too late to conduct a search of the area where she disappeared.

Mrs. Gast's body was found by a hiker at 6:30 a.m. on the morning of October 15, 2005.  She was lying on her back about one-half mile from the roadway, mauka of the pavilion area.  She was barefoot and one of her sandals was found about 12 feet away from her body.  The pictures developed from her camera showed that she had taken photographs of the scenery near the area she was found. The area where she was found was about twenty yards from the active lava flow. She had burns on her feet and back.  The cause of death was listed as thermal burns with probable hyperthermia.

## III.    THE PROFFERED EXPERT TESTIMONY

### A.    STEPHEN B. KEMBLE, M.D.

Defendant Shin Jin Hawaii Travel and Tours has retained a Honolulu Psychiatrist, Stephen B. Kemble, for his "opinion concerning possible psychiatric factors affecting Mrs. Gast's death on October 14, 2002."  March 20, 2005 Letter to Dennis E.W. O'Connor, Jr. from Stephen B. Kemble ("Kemble Report" attached hereto as Exhibit 1).  According to Dr. Kemble's Curriculum Vitae, he was board certified in psychiatry in 1983 and in addictive medicine in 1990.

After reviewing medical evidence and deposition testimony, Dr. Kemble
provides the following account of Mrs. Gast's actions:

> She was apparently calm and in good humor on the
> morning of 10/14 when she left the boat. By the time the
> tour reached the lava field, she was becoming anxious
> about being away from the boat when her husband
> returned, and wanted to get back as soon as possible. By
> all accounts, she had no interest in seeing the lava, but
> was focused on finding a ride back as early as possible.
> She was behaving impatiently, but not in a confused or
> strange way, up to the point when her last hope of an
> early ride back was denied. ***Her behavior and intentions***
> ***apparently changed abruptly after that. She went***
> ***hiking half a mile inland, away from the trail, along***
> ***side the lava, and far away from other people. She***
> ***stopped to take pictures, then removed her shoes and***
> ***walked out onto a still steaming lava field and lay down***
> ***on her back with a cigarette in her hand. It seems most***
> ***likely that she died soon thereafter, in the middle of the***
> ***day on October 14.***

Kemble Report at page 7 (emphasis added). There is no direct evidence to support
the "abrupt change" in Mrs. Gast's behavior posited by Dr. Kemble. Nor is there
any direct evidence that Mrs. Gast "removed her shoes and walked out onto a still
steaming lava field and lay down on her back". One could more rationally infer
that she fled when her plastic shoes started to melt, tried to fling the melting shoes
off, and collapsed shortly thereafter.

Dr. Kemble then provides the following analysis, under the heading
"Theories to Explain Mrs. Gast's Death":

Theories invoked by Dr. Tam and others assume a confusional state due to heat stroke, inhalation of volcanic fumes, or perhaps hypoxia, a cardiac arrhythmia, or hypoglycemia. She apparently took her normal morning medication, as the morning pill container was empty, so medication issues do not explain her behavior. However, I find it very difficult to imagine a confusional state due to heat, fumes, medications, or any other medical cause, which can explain the abrupt change in her behavior that began in the turnaround loop on the road, away from the lava and fumes, and caused her to engage in sustained, purposeful behavior such as hiking ½ mile, taking pictures, removing her shoes and smoking a cigarette while lying down on her back on a hot lava field.

However, I can think of a few variants on a psychiatric explanation for what happened, which would be consistent with all the known facts.

The first is that she was feeling fearful that her husband would be angry with her and guilty and ashamed of "never doing anything right." When she could not find an earlier ride back, she resolved in the parking lot to commit suicide. She then hiked away from the road, looking for a secluded spot where she would not be found, paused to take pictures, and then deliberately walked out onto the hot lava field and lay down.

The second variant is that when she could not find an earlier ride she became panicky and bolted from the parking lot, trying to get away from other people. Once away from the road, she kept going until she calmed down enough to take pictures. Then she felt caught by the fact that she undoubtedly missed her ride back, and fearful that her husband would be angry with her, or guilty and ashamed of her anxiety, leading to a decision to commit suicide by lying on hot lava.

8

The third explanation would involve some kind of dissociative episode such as a fugue state. This would consist of an abrupt shift to an altered state of mind which was discrepant from her usual state, and which could include sustained purposeful actions that she would not do in her usual state of mind. Dissociative states are often associated with a history of early childhood abuse, particularly sexual abuse, and there is some indication Mrs. Gast was a victim of childhood abuse. This theory would also involve deliberate suicidal behavior at the end, although it would have arisen from her altered state, and not just from the anxiety she was feeling about being late to return to the ship and to her husband. However, she did not have a history of dissociative states, making this explanation less likely.

All these psychiatric explanations involve deliberate self-destructive behavior by Mrs. Gast, occurring over a relatively short time span, of the sort that could not have been prevented by any reasonably possible actions on the part of the tour driver, the National Park Service, the police or the cruise ship company.

My conclusion is that the immediate cause of Mrs. Gast's death was most likely suicide, accomplished by deliberately isolating herself from the tour group and other people, lying down on hot lava, and waiting to die. A background and contributing cause was her Bipolar Disorder, and associated self-esteem problems and emotional instability and fragility.

Kemble Report at page 8-9. These "theories" are pure flights of imagination, striking in that they exclude the far more probable likelihood that Mrs. Gast went to look for her group and got lost on the lava and then was overcome by the heat and gases. In addition, Dr. Kemble's "theories" are not based on or tied to any scientific methodology, or studies. They are instead obviously created to give the

Defendants evidence that will create a bad picture of Mrs. Gast – since none of his theories obviate the fact that Defendants abandoned Mrs. Gast in an extremely dangerous place. If she had been properly taken care of by the Defendants in this case, she never would have been out on that lava field alone.

**B.    MICHAEL H. STONE, M.D.**

Michael H. Stone, M.D. was retained by the United States to render opinions, and specifically to respond to expert witnesses retained by the Plaintiffs. Dr. Stone is board certified in psychiatry and has co-authored books and articles on the subjects of personality disorder and symptom disorders, April 5, 2005 Letter to R. Michael Burke, U.S.A. from Michael H. Stone, M.D. ("Stone Report" attached hereto as Exhibit 2). He does not agree with Dr. Kemble that Mrs. Gast committed suicide by deliberately lying down on hot lava.

Based on his review of records and depositions, Dr. Stone states the following conclusions about how Mrs. Gast's death occurred:

> There are a number of mysterious and unsolved aspects in the death of Mrs. Gast, related in large part to her having inexplicably wandered away from the tourist group which she had earlier been a part of her final morning. Absent observers who witnessed her final movements and death, and owing to the necessarily imperfect nature of the autopsy because of the charring and other heat-effects upon the body, one cannot say with authenticity whether her death was (a) purely accidental (brought about by heat stroke and fainting in the lava area), (b) accidental but related in some measure by the

> potentially aggravating effects of some of the medications she had been taking, (c) accidental but related in part to her bipolar condition – which is often associated with impulsive and risk taking behavior, or (d) willed, and therefore a manifestation of a sudden or even planned suicidal impulse.

Stone Report at 7-8. Dr. Stone does not offer an opinion to a reasonable medical probability as to which of these scenarios occurred.    At his deposition, he specifically could not say which of his scenarios was more likely than not. (Stone depo:

> Dr. Stone concludes:

>> Even if it could be demonstrated that she was not suicidal at the time of her death, the (absent suicidality) accidental nature of her death was in my opinion, to a level or reasonable medical probability, not a pure accident (like being rear-ended by a drunk driver or being struck by a stone from the roof of a building), but rather was an accident that was, as it were, waiting to happen – in a woman with several risk factors that raised the likelihood for such an occurrence: her bipolar illness, her tendency to get lost and to suffer ill effects from exposure to severe heat, the latter possibly aggravated by some of her medications.

Stone Report at 9.    He seems to discount her death and value as a person, describing her as "an accident waiting to happen." Such testimony is inflammatory and highly prejudicial, and of no probative value.

Dr. Stone was deposed in this case.    He testified that he disagreed with Dr. Kemble's conclusion that Mrs. Gast laid down on the lava to kill herself:

> I don't think anybody, as I just got through saying, even a
> suicidal person intending suicide would lie down on hot
> lava, because the pain of lying down on hot lava, if you
> are conscious, would override any thought you would
> have about dying in that particular way at that moment.
> You would get away. I feel rather strongly about that.
> However, we don't know whether the lava was hot as she
> laid down. Most likely, my suggestion is that suicide is a
> possibility. Dr. Kemble expresses it rather more strongly
> than I, so that might be a difference. I don't rule out
> suicide, but he felt rather more certain than I about that,
> and as I say, I agree with the bipolar diagnosis, but I don't
> agree that a conscious person, even who was motivated
> by suicidal impulses, would remain on hot lava if they
> were conscious.

Stone Report at pages 56-57. While Dr. Stone suggests that suicide is a possibility,

an opinion which in and of itself is inadmissible as a "possibility" rather than a

reasonable "probability," his statement that even a suicidal person who was

conscious would not remain on hot lava shows that any contention that she

committed suicide by lying on the lave is worse than speculative, and should be

excluded.

## IV.    STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied

12

the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The party seeking to introduce the testimony of the expert testimony has the burden of demonstrating its admissibility. Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendments) (party putting forward expert has the burden of proving by a preponderance of the evidence that the testimony is reliable and relevant); *United States v. Kelley*, 6 F.Supp.2d 1168, 1183 (D. Kan. 1998).

In *Daubert v. Merrell Dow Pharmacueticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that trial court must act as a gatekeeper to prevent unreliable speculation or conjecture from entering the courtroom under the guise of scientific testimony. 509 U.S. at 592-93. The trial court's role "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The trial court should conduct a threshold analysis to ensure that the expert's methods are both relevant to the issue at hand and reliable. *Daubert*, 526 U.S. at 595. In conducting this analysis, the Court should determine whether the expert's testimony reflects (1) "scientific knowledge," and (2) will assist the trier of fact to understand or determine a material fact at issue. *Kennedy v. Collagen Corp.*, 161

13

F.3d 1226, 1227-1228 (9th Cir.1998) (citing *Daubert*, 509 U.S. at 592).    The elements of the inquiry are discussed below.

## A.    RELIABLE AND BASED UPON SCIENTIFIC KNOWLEDGE

In order to show that expert testimony is reliable, the proponent of the evidence to show that the expert's opinions are grounded on the facts in evidence. "Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.1997).

In order to show the reliability of expert testimony, the proponent must also show the opinion is grounded in scientific knowledge.  In *Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir.1998), the Ninth Circuit set forth a non-exclusive list of factors the gatekeeping court should consider to determine whether the opinion testimony is based on "scientific knowledge."

> District court judges are to consider not only (1) whether the method has gained general acceptance in the relevant scientific community, but also (2) whether the method has been peer-reviewed, (3) whether the method "can be (and has been) tested," and (4) whether there is a "known or potential rate of error." *Id.* at 594, 113 S.Ct. at 2797....
> [T]he Daubert inquiry is flexible.... "One very significant fact" is whether the expert has "developed [his] opinions expressly for purposes of testifying," since "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert*, 43 F.3d at

1317.

134 F.3d at 1420-21.

## B.    HELPFUL TO THE TRIER OF FACT

The second requirement of Federal Rule of Evidence 702 under *Daubert* is

that the expert testimony must assist the trier of fact. *Kennedy v. Collagen Corp.,*

161 F.3d 1226, 1230 (9th Cir.1998).    Relevance is the necessary first step in this

inquiry.

> In order to assist the trier of fact, proposed expert
> testimony must also be relevant, that is it must be
> sufficiently tied to the facts of the case to "make the
> existence of any fact that is of consequence to the
> determination of the action more probable or less
> probable than it would be without the evidence."
> Fed.R.Evid. 401.  *See Daubert,* 509 U.S. at 591, 113
> S.Ct. 2786;  *Campbell v. Metro. Prop. & Cas. Ins. Co.,*
> 239 F.3d 179, 184 (2d Cir.2001).  This consideration has
> been described as "fit." *See Daubert,* 509 U.S. at 591

*Blanchard v. Eli Lilly & Co.,* 207 F. Supp.2d 308, 315 (D. Vt. 2002).

As the court explained in *Goodwin v. Danek Medical, Inc.,* 1999 WL

1117007 (D. Nev. 1999), the proponent of expert testimony must show a fit

between the scientific inquiry and a matter at issue in the case.

> Under Rule 702, the test for admissibility is whether the
> jury will receive "appreciable help." *U.S. v. Gwaltney,*
> 790 F.2d 1378, 1381 (9th Cir.1986). Rule 702's
> "helpfulness" standard requires a valid scientific
> connection to the pertinent inquiry as a precondition to
> admissibility. *Daubert v. Merrell Dow Pharmaceuticals,*

15

*Inc.,* 43 F.3d 1311, 1320 (9th Cir.1995) (Daubert II)
(citation omitted).

1999 WL 1117007 at 4.

## V.    ARGUMENT

### A.    DR. KEMBLE'S TESTIMONY IS NOT RELIABLE UNDER DAUBERT

#### 1.    DR. KEMBLE'S TESTIMONY IS BASED ON CONJECTURE RATHER THAN FACTS

Dr. Kemble's opinion in this is premised on his speculation that, after Mrs. Gast could not find an early ride back to the ship, her demeanor abruptly changed and she purposefully hiked half a mile out on to the lava field where her body was found. There is no evidence to support his view of the facts. The few clues that exist concerning Mrs. Gast's last hours – her camera, her one sandal, her cigarette, and the location and position of her body – are not sufficient to support to an inference that she abruptly, purposefully and inexplicably hiked half a mile out on to the lava when she could not find an early ride back. It is more reasonable to infer that Mrs. Gast became lost or disoriented while looking for her group, or while looking for help after she was abandoned at the deserted site.

Opinion based on speculation and conjecture is not reliable or admissible under <u>*Daubert*</u>. The <u>Daubert</u> Court cautioned that "[c]onjectures that are probably wrong are of little use ... in the project of reaching a quick, final, and binding legal

judgment--often of great consequence--about a particular set of events in the past." 509 U.S. at 597.    The United States Court of Appeals for the Ninth Circuit agrees that "Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." _Diviero v. Uniroyal Goodrich Tire Co._, 114 F.3d at 853.

Courts routinely hold that, when experts base their opinion on speculation and conjecture rather than record evidence, those opinions do not assist the trier of facts and are not admissible in evidence.    In _Mink Mart, Inc. v. Reliance Insurance Co._, 65 F.Supp.2d 176 (S.D.N.Y. 1993), the court explained that expert opinion based on conjecture rather than fact is not sufficiently reliable under the federal rules:

> Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all expert testimony is not only relevant, but reliable. _Kumho Tire Co. v. Carmichael,_ 526 U.S. 137, ----, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999).    In order for an expert's opinion to be reliable and thus admissible, it must be grounded on verifiable propositions of fact. _In re "Agent Orange" Prod. Liab, Litig.,_ 611 F.Supp. 1223, 1249 (E.D.N.Y.1985), _aff'd on other grounds,_ 818 F.2d 187 (2d Cir.1987). "Nothing in either [_Daubert v. Merrell Dow Pharmaceuticals, Inc.,_ 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),] or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the _ipse dixit_ of the expert." _Kumho Tire,_ 526 U.S. at ----, 119 S.Ct. at 1179.

65 F.Supp.2d at 180-81.  *See also McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800-01 (6th Cir.2000) ("an expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known.... An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.") (quotations omitted);  *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072-73 (6th Cir.1999) (affirming trial court's decision in a CERCLA case to strike proposed expert's affidavit as based on "speculation, conjecture, and possibility" and affirming trial court's holding that the "inadequate factual basis" made the proposed expert's affidavit "scientifically unreliable").

Dr. Kemble's opinions are not "grounded on verifiable propositions of fact." *Mink Mart, Inc. v. Reliance Insurance Co.*, 65 F.Supp.2d at 180-81.  There is no eyewitness testimony or circumstantial evidence sufficient to establish what transpired in Mrs. Gast's final hours.  Kemble cannot use "opinion" to fill in the missing evidence.  As the Maryland appellate court observed in *State Department of Health v. Walker*, "[t]he opinion of an expert . . . must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and **cannot be invoked to supply the substantial facts necessary to support such conclusion.**"  209 A.2d 555 (Md. 1965) (emphasis assed).  In *Marathon Corp. v. Pitzner*, 106 S.W.3d 724 (Tex. 2003), the court rejected expert testimony that purported to explain how an

individual working on defendant's roof came to be found unconscious in the parking lot, with his ladder tipped over and burnt screwdriver next to him on the ground.    The court observed that the expert's opinion "pile speculation on speculation and inference on inference"; and that,"[o]n this record, the circumstances 'could give rise to any number of inferences, none more probable than another.'"    106 S.W.2d at 729.

In this case, the record case suggests a number of possibilities about Mrs. Gast's final hours, but provides no factual basis for declaring, as Dr. Kemble has, that Mrs. Gast abruptly changed her attitude and demeanor and purposefully hiked half a mile from the parking area rather than waiting for a ride back to the ship.  It is just as possible that Mrs. Gast went back to the trail to find her group and because lost, or that she became disabled by heat or anxiety in the restroom or some area that could not be seen from the parking lot.   Since Dr. Kemble's conclusion that Mrs. Gast committed suicide is based on his unfounded speculation about her actions, it is unreliable and inadmissible under Daubert.[2]

---

[2] Dr. Kemble's opinion in this case is distinguishable from testimony he gave in the case of Aga v. Hundahl, 78 Hawai'i 230, 891 P.2d 1022 (1995).  In that case Dr. Kemble was permitted to testify that a patient's death was based on a conscious decision to commit suicide rather than drug-induced psychosis.  However, in Aga there was an eyewitness to the patient's death, and thus Dr. Kemble's opinions were not based upon speculation and conjecture about the patient's actions, as they are here.

2.    KEMBLE'S TESTIMONY IS NOT BASED ON SCIENTIFIC TESTIMONY

Under the Federal Rules of Evidence, one does not become qualified to provide "expert scientific" opinion merely by virtue of possessing a medical degree; rather, "[t]he adjective 'scientific' implies [that one's opinion has] a grounding in the methods and procedures of science." *Flores v. Johnson*, 210 F.3d 456, 458 (5th Cir. 2000) (Garza, J, concurring).    *Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir.1998), the Ninth Circuit set forth a non-exclusive list of factors the gatekeeping court should consider to determine whether the opinion testimony is based on "scientific knowledge."

> District court judges are to consider not only (1) whether the method has gained general acceptance in the relevant scientific community, but also (2) whether the method has been peer-reviewed, (3) whether the method "can be (and has been) tested," and (4) whether there is a "known or potential rate of error." *Id.* at 594, 113 S.Ct. at 2797.... [T]he Daubert inquiry is flexible.... "One very significant fact" is whether the expert has "developed [his] opinions expressly for purposes of testifying," since "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert,* 43 F.3d at 1317.

134 F.3d at 1420-21.

In this case, Dr. Kemble's report does not reveal that any scientific method was used in the formulation of his opinion with regard to suicide. The record does not reveal that he used any particular scientific methodology or relied on any verifiable method of analysis. He did not rely on any research or data in

20

formulating his opinion, and it does not appear that way in which the correctness of his conclusion can be tested.

His opinions were clearly formulated solely for purposes of litigation. Under the circumstances, there is no way in which Dr. Kemble's conclusions can be considered to reflect reliable scientific knowledge. *Daubert* observed that an expert's opinion is reliable if it is derived from the foundations of science rather than subjective belief. 509 U.S. at 589-90. Dr. Kemble's opinion is not reliable under this criteria.

## B    DR. STONE'S TESTIMONY IS NOT RELIABLE AND WOULD NOT ASSIST THE TRIER OF FACT

### 1.    DR. STONE'S OPINIONS ARE ALSO BASED ON CONJECTURE

Dr. Stone like Dr. Kemble relies on speculation and conjecture about what happened to Mrs. Gast on the morning of October 14, 2005. Dr. Stone states that Mrs. Gast "inexplicably wander[ed] away from the tourist group which she had earlier been a part of her final morning." Stone Report at 7. There is no evidence to support a finding that Mrs. Gast "wandered away" from the tourist group. It is just as likely that she went to find them, or another ride back, and then became lost and disoriented due to the extreme conditions. Dr. Stone's opinion is based on conjecture rather than evidence, and therefore it is not reliable under the Federal Rules of Evidence.

21

### 2.    DR. STONE'S OPINIONS DON'T MEET THE STANDARD FOR SCIENTIFIC KNOWLEDGE

Dr. Stone's opinions on the way Mrs. Gast died, like Dr. Kemble's, do not rely on any apparent methodology that can be evaluated or verified. He does reference a study on the risk of suicide for persons with bipolar disorder, Stone Report at 7-8, but concludes himself that the facts of Mrs. Gast's death made suicide unlikely. Stone Report at pages 56-57. He mentions a comment about accident proneness in a publication called "Bipolar Network News," Stone Report at 7, but there is no indication that this comment was arrived at using any scientific methodology. Under the circumstances, since Dr. Stone's opinion does not provide any basis for finding that it is based on scientific knowledge, it should not be admissible herein.

### 3.    DR. STONE'S TESTIMONY WOULD NOT AID THE TRIER OF FACT

Even if this Court were to find Stone's testimony reliable, there is no fit between his opinions and the matters at issue in this case. While Stone concedes that he cannot determine "with authenticity" the circumstances of Mrs. Gast's death, Stone Report at 7, he is willing to state an opinion that:

> The [] accidental nature of her death was in my opinion, to a level or reasonable medical probably, not a pure accident (like being rear-ended by a drunk driver or being struck by a stone from the roof of a building), but rather was an accident that was, as it were, waiting to happen –

22

> in a woman with several risk factors that raised the likelihood for such an occurrence: her bipolar illness, her tendency to get lost and to suffer ill effects from exposure to severe heat, the latter possibly aggravated by some of her medications

Stone Report at 9. Dr. Stone's view that Mrs. Gast's death "was an accident waiting to happen" offers no assistance to the trier of fact as to matters at issue in this case. There is no "fit" between his opinion and the matters at issue as required under the *Daubert* analysis. *Blanchard v. Eli Lilly & Co.*, 207 F. Supp.2d at 315 (D. Vt. 2002).

The United States may claim that Dr. Stone's testimony assists the trier of fact on the issue of contributory negligence, but this is not in fact the case. If the question of contributory fault were to reach the trier of fact, the trier of fact would need to determine what Mrs. Gast did, and whether her actions showed a lack of reasonable care. Dr. Stone cannot say "with authenticity" what Mrs. Gast did, so his opinion would not aid the trier of fact in resolving the issue of contributory fault. Moreover, while the phrase "accident waiting to happen" sounds suggestive of contributory fault, it offers no guidance to the trier of fact in determining whether Mrs. Gast used ordinary care.

### C.    ALL OTHER REFERENCES TO SUICIDE IN RELATION TO MRS. GAST'S DEATH SHOULD BE EXCLUDED

Mrs. Gast's medical records also contain occasional references to suicidal ideation. All such evidence should be excluded at trial, as there is absolutely no reason to believe that Mrs. Gast in fact killed herself. As shown above, the defendants' expert testimony to the contrary is unreliable and speculative. In addition, Mrs. Gast's treating physicians – who knew her well – disbelieved any suggestion that she committed suicide. Her treating physician testified that " … [f]or as much as she talked about suicide, she never even made a gesture over tow years, so that was off and on medication. It appears [if she was carrying her pill pox with her] it appears she was taking her medication. Johnson Depo. 65: 15-19. When asked is she committed suicide, he stated "I have to go by her past behavior, past behavior does not show that she is – she is the type of individual who would carrry it through." Johnson Depo 68:10-12. Mr. Magruder, her psychotherapist, testified that Mrs. Gast was not a risk taker, and that he did not think she committed suicide. Magruder Depo, 40:24-25, 41: 14-15.

FRE 403 provides that:

> [a]lthough relevant, evidence may be exluced if its probative value is substantially outweighed by the danger of unfair prejudice confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In other words, there is a line to be drawn when the potentially inflammatory nature of the information exceeds it probative value. A trial court's duty is to balance these factors, to ensure that the primary effect of evidence is to advance an issue in the case rather than to appeal to the jury's emotions or "arous[e] its sense of horror, provok[e] its instinct to punish, or trigge[r] other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case. 1 J. Weinstein & M. Berger, Weinstein's Evidence Section 403[03], at 403-33-39 (1991).

Because references to suicide – when there is no evidence that she committed suicide here -- may unfairly prejudice the jury, all such evidence should be excluded. Mrs. Gast's suicidal ideation was part and parcel of her mental illness. Testimony based on Mrs. Gast's history of mental disorder is also unduly prejudicial. *Klein v. Vanek*, 86 F.Supp.2d 812 (N.D. Ill. 2000) (court disallows expert testimony on plaintiff's bipolar disorder as unduly prejudicial and not sufficiently related to matters at issue). Courts routinely reject testimony regarding mental illness where there is a meaningful risk that the trier of fact would judge plaintiff on the basis of her mental illness rather that her conduct at the time. *Rascon v. Hardiman*, 803 F.2d 269, 278 (7th Cir.1986). That risk is certainly present here – in fact Drs. Stone's and Kemble's opinions invites the trier of fact to draw inferences about Mrs. Gast's conduct from the fact of her mental

disorder – inferences which are not permissible under the law. Indeed, the defendants' attempts to take evade liability by focusing on Mrs. Gast's mental health issues is also impermissible under the "eggshell plaintiff" rule. This rule embraces the principles that a tortfeasor must accept a plaintiff as he finds him and may not escape or reduce damages by highlighting the injured party's susceptibility to injury. *See Benn v. Thomas,* 512 N.W.2d 537 (Iowa 1994); *Hoffman v. Schafer,* 815 P.2d 971 (Colo.App.1991) *aff'd Schafer v. Hoffman,* 831 P.2d 897 (1992); *Casey v. Fredrickson Motor Express Corp.,* 97 N.C.App. 49, 387 S.E.2d 177 (1990); *see also Prosser and Keeton on the Law of Torts* § 43, p. 292 (5th ed. 1984).

In addition, under the Federal Rules of Evidence, prior acts and medical history cannot fill in the missing link with regard to Mrs. Gast's actions. Evidence that Mrs. Gast had suicidal thoughts and had difficulty with rage on occasion in the past is not relevant to showing what she did at the time of the incident when there is no proof she was suicidal or angry. Evidence that persons with bipolar disorder are often impulsive or careless is an impermissible attempt by Dr. Stone to introduce evidence of a character for impulsiveness and carelessness in order to show that Mrs. Gast acted in conformance with those character traits at the time of the incident. Fed. R. Evid. 404(a).

26

If the expert opinion are excluded, then counsel should be precluded from making similar unsubstantiated arguments to the jury.

## VI.    CONCLUSION

For the reasons set forth herein, the testimony and reports of Drs. Kemble and Stone with regard to Mrs. Gast and suicide are neither reliable nor helpful to the trier of fact.    References in her medical records to suicidal ideation or other arguments or comments by counsel may well inflame or unfairly prejudice or confuse the jury and should be excluded.    Accordingly, this Court should exercise its authority to exclude all of this type of evidence.

DATED:  Honolulu, Hawai'i  May 30, 2006.


MARK S. DAVIS
Attorney for Plaintiffs