**STEPHEN B. KEMBLE, M.D.**
**PSYCHIATRIC ASSOCIATES, LTD.**

ONE KAPIOLANI BUILDING, SUITE 402
600 KAPIOLANI BOULEVARD
HONOLULU, HI 96813
TELEPHONE (808) 537-2665
FAX (808) 524-3747

November 30, 2005

Dennis E.W. O'Connor, Esq.
Reinwald O'Connor & Playdon, LLP
733 Bishop Street, Ste. 2400
Honolulu, HI 96813

Re:   Gast, v. Sung Ki Kwak et al
      Civil No. CV04-00079 DAE/BMK

Dear Mr. O'Connor,

I have reviewed the Supplementary Report of Dr. Michael Stone, M.D., dated Nov. 1, 2005, and would like to add further comments of my own, constituting my **Supplementary Report** to add to my initial report dated March 20, 2005, and my Declaration, dated November 10, 2005. The treatment notes and deposition of Mrs. Gast's therapist, Stephen Magruder, L.C.S.W., and Dr. Stone's Supplementary Report were made available to me after I prepared my report on March 20.

First, I concur with Dr. Stone's summary and time log of records prepared by Stephen Magruder, L.C.S.W. during the course of his psychotherapy treatment of Mrs. Gast between 3/11/94 and 7/3/00. There is ample evidence from these records that Mrs. Gast had a long history of labile emotions, impulsive and sometimes self-destructive behavior, suicidal thoughts and at times threats, multiple automobile accidents, marital conflicts, substance abuse, and fears of rejection and abandonment. On occasions when she felt or anticipated rejection, often out of proportion to reality, she would feel like drinking or using drugs, leaving, or sometimes have suicidal thoughts. (See Mr. Magruder's treatment notes dated 3/11/94, 4/5/94, 4/22/94, 5/27/94, 9/9/94, 10/21/94, 11/15/95, 1/25/96, 1/31/96, 5/1/96, 5/8/96, 2/24/97, 11/4/97, 3/11/98, 2/3/00, 3/6/00, 5/25/00, and 7/3/00.) In his deposition, Mr. Magruder referred to Mrs. Gast's "extreme rejection sensitivity" (Magruder deposition, p. 20), and fear of anger in herself or toward her from others, leading to suicidal thoughts and risk-taking behavior (Magruder deposition, pp 40-41 and 66-68). Based on Mr. Magruder's notes and comments in his deposition, Mrs. Gast meets criteria for **Borderline Personality Disorder**, including at least: "frantic efforts to avoid real or imagined abandonment," "markedly and persistently unstable self image or sense of self," "impulsivity in at least two areas that are potentially self-damaging, e.g., . . . substance abuse, reckless driving, binge eating," "recurrent suicidal behavior, gestures, or threats or self-mutilating behavior," "affective instability due to a marked reactivity of mood," and "chronic feelings of emptiness."

**EXHIBIT A**

GAST V. SUNG KI KWAK, ET. AL.
NOVEMBER 30, 2005
PAGE TWO

I would also like to point out several facts and observations of witnesses on the day of her death, which are relevant to the issue of whether her death was more likely due to suicide or accident. Incidentally, I have personal knowledge of the area, having visited the edge of the lava flow at the end of the Chain of Craters Road 3 times in the past 4 years on family vacations, including a visit in January, 2003, three months after Mrs. Gast's death.

1. I believe it is unlikely that Mrs. Gast was planning suicide when she left the cruise ship on the morning of October 14, 2002. Eyewitness reports of her behavior and the photo of her leaving the ship indicate she was cheerful and not distressed that morning. If she were contemplating suicide, it seems likely she would have taken more than just that day's medications with her, but she had only that day's doses. It also seems inconceivable that anyone would plan in advance to use the volcano to commit suicide, especially if they had never visited it and had only the usual public imagination of boiling lava and a fiery death. In reality, using a warm, recent lava flow, which is not too hot to walk on, but hot enough that one would not survive lying on it for an hour, is not at all implausible. One would know that only after experiencing walking on such a flow and seeing what it was like.

2. Eyewitness accounts indicate that Mrs. Gast became increasingly anxious when she realized that the tour would take longer than she expected and that she anticipated that her husband would be angry with her if she were not back at the ship when he returned from his helicopter tour later that morning. According to Ms. Hathaway, her tour guide, when they were heading out toward the active lava flow (10:30 AM), Mrs. Gast was "definitely less motivated than the others to get there." They hiked ¼ mile to the end of the road and about 30 feet out onto the recent lava flow (formed within weeks to months), which would have been hotter than the pavement on the road, but not too hot to walk on. At this point, Mrs. Gast said she did not want to go any farther, and Ms. Hathaway told her to go back to the pavilion and wait for the rest of the tour group to return at 11:00 AM. Others who accompanied Mrs. Gast recalled her saying, "My husband always tells me I can never do anything right." Once back at the pavilion and turn-around area, she attempted to find an earlier ride back to the ship, but was turned down (about 10:45 AM). Mr. Ammasi, the tour driver who turned her down, says she told him she wanted to get back as soon as possible because she had not informed her husband that she was going on the tour. She said that coming on the tour had been a mistake. She said she was not having any health problem, but just wished she wasn't there and wanted to get back to the ship. He told her that he could not give her a ride for liability reasons, but that her own tour would be back within 10 to 15 minutes, and would get back to the boat before his tour anyhow, since he was planning to make a stop on the way back.

3. Sometime between 10:45 AM and when the others returned to the turnaround area at 11:00 AM, Mrs. Gast left the kiosk-turnaround area. Mr. Davis, the attorney for

GAST V. SUNG KI KWAK, ET. AL.
NOVEMBER 30, 2005
PAGE THREE

the plaintiffs, says there is no evidence that Mrs. Gast's demeanor (intentions) suddenly changed. However, the facts are that up until 10:45 AM, by all accounts she was intent on getting back to the ship as soon as possible. Between 10:45 and 11:00 AM, she left the populated area where her tour group was expected to arrive within 10-15 minutes. Her body was found on a warm, recent lava flow, about ½ mile inland, far from any trail or any other people, and accompanied by pictures in her camera, taken in the middle of the day, of the area near where her body was found. In order to get to that location, she had to travel almost ½ mile across an old lava field, which was at least several hundred years old, fully cooled, with tufts of grass and scattered bushes and small trees. (See NPS maps and photos of the area.) For all but the last dozen yards or so, when she walked onto a very recent lava flow, this was rolling, irregular ground, requiring attention to ones footing, but not particularly difficult, and no hotter than an asphalt city street on a 90-degree afternoon. *She had to have known that if she left the kiosk-turnaround area, she would miss her ride back with the rest of her tour, and it appears likely that when she left that area she had no intention of returning with them.* This is what I refer to as an abrupt change in her behavior and intentions.

4. Mr. Davis has speculated that Mrs. Gast left the turnaround area due to disorientation or after being abandoned by her tour group. *I find no evidence from eyewitness accounts or physical evidence at the scene to support the theory that Mrs. Gast left the turnaround-kiosk area due to confusion or disorientation. Furthermore, there is no plausible medical theory for why she would have become confused or disoriented at 10:45 AM on 10/14/02 in that location.* The kiosk-turnaround area was far from any active lava or fumes. Based on the National Park Service maps of the area at the time (which match my own recollection from visiting the area several times), The kiosk and turnaround were on the paved Chain of Craters Road at least 1/4 mile from the edge of the recent lava flow where it covers the road, and at least 1/3 mile from any active surface lava. Furthermore, the NPS logs indicate that the weather that day was clear, and the wind was blowing lightly from the East, which means any fumes or smoke from the flow would be blowing away from the kiosk and turnaround area. The log indicates it was a "clear, very hot day." However, the ambient air temperature in Hawaii at sea level in October (away from new lava, which this was) never gets above the low 90's, and conditions in the turnaround area would have been no more severe than standing on an asphalt city street on a 90 degree day. When Mrs. Gast was last seen around 10:45 AM, Mr. Ammasi and other witnesses all agreed she did not appear confused or in distress for health reasons and she herself told Mr. Ammasi she was not having health problems. Based on the evidence of the pictures in her camera, she arrived at the site of her death in the middle of the day, which would require purposeful hiking across old lava to get there, ½ mile from the kiosk area and away from any road or trail. Furthermore, the physical

GAST V. SUNG KI KWAK, ET. AL.
NOVEMBER 30, 2005
PAGE FOUR

    evidence at the site of her death includes the facts that she took pictures there, and that her body was found supine, with her purse on her chest, the camera in the purse, and a cigarette in her hand, all of which strongly suggest she was in control of her actions and had arranged herself there, and did not stumble into the site of her death in a state of confusion. The *only* reason to invoke a theory that she had become disoriented is that the experts reviewing the case could not imagine someone deliberately lying down on hot lava. However, there is no physical or eyewitness evidence at all to support the theory that she acted out of confusion or disorientation, and a lot of evidence to suggest otherwise.

5. *At the time when she left the kiosk-turnaround area, Mrs. Gast was not "abandoned" by her tour group.* She started walking with the group a little ways onto the recent lava flow, and said she did not want to continue. She was told by Ms. Hathaway at around 10:35 AM to return to the kiosk area, which was clearly visible from where they were, and that they would meet in the kiosk area at 11:00 AM. She did return to the kiosk area area, at least initially. There were other tours there, and there are always a lot of private cars and people coming and going to see the lava at that time of day. When the group arrived at 11:00 and could not find her, they vigorously searched the area for her for about 30 minutes, with no success. (This is not surprising, considering where her body was found.)

Based on these facts, I believe the only medically plausible explanation for what happened is as follows. Regular type indicates events documented by eyewitnesses or physical evidence. Italics indicate events inferred by me, but based closely on available evidence.

    Mrs. Gast left the cruise ship on the morning of 10/14/02 in reasonably good spirits, looking for something to do while her husband was on a helicopter tour of the volcano for the morning. She was hesitant about joining one of the van tours to the lava flow, but decided at the last minute to go with Ms. Hathaway's tour. On the way to the lava, she heard a lecture by Ms. Hathaway, repeated twice, on the dangers of new lava, and on recommended safety precautions. She also picked up a brochure warning of these dangers at the Volcanos NP Headquarters, which she had with her when her body was found the next day. *The trip turned out to be longer than she had expected, and she became increasingly anxious that she would not make it back before her husband, and began to fear that he would be angry with her.* Eyewitness accounts of her behavior when the group arrived at the end of the Chain of Craters Road and comments to others after she arrived all confirm this scenario. She initially joined some of the tour group, including Ms. Hathaway, and walked to the end of the road and about 30 feet onto the recent lava flow. The flow would have been somewhat hotter than the pavement, but not red hot, and she experienced walking safely on a warm, recent lava flow. She was

GAST V. SUNG KI KWAK, ET. AL.
NOVEMBER 30, 2005
PAGE FIVE

increasingly impatient to get back to the ship, so she told Ms. Hathaway she wanted to go back. Ms. Hathaway told her to wait at the kiosk, and the others would meet there at 11:00 AM. She returned to the kiosk-turnaround area and then tried to find an earlier ride back. *When her efforts were unsuccessful, she was confronted with the impossibility of getting back before her husband, and her fears that he would be angry with her escalated.* Based on what we know of her psychology from Mr. Magruder's records and the typical psychology of people with Borderline Personality Disorder, fear of her husband's anger would very likely have led to thoughts of suicide. *At some point soon after 10:45 AM, she resolved that suicide would be better than facing her husband's anticipated anger. That would have been her motive, but she needed a means. She had only her days' supply of medications, which would certainly not have been lethal, and she had no weapon. She then thought of using the lava, based on the warnings in Ms. Hathaway's lectures and the NPS brochure, plus her experience of walking on a recent flow a few minutes before. She needed a place far from other people, where the lava was cool enough to walk on, but hot enough that she would die in a reasonable period of time. She needed an area of the flow which was a little more recent than what she had just walked on, and she spotted some smoke from an active flow about ½ mile inland.* She left the turnaround area when no one was looking and headed across the old lava field mauka of the turnaround area, toward the active flow and away from everyone else. When she arrived at the edge of the recent flow, she paused to take pictures of the area, and perhaps to ponder her predicament. *She knew she had missed her ride back to the ship, and her belief that her husband would be angry with her if she went back would only have escalated. She re-affirmed her suicide decision.* She found a suitable area of the lava flow which was fairly recent and hot to the touch, but had a cooled crust on which she could walk without burning up. She found a suitable location and lay down on her back, with her purse on her chest, smoked a cigarette, and waited until she passed out from the heat and died. When her body was found the next morning, there was thermal damage to her body, but her clothing had not burst into flames, and her camera and its film were intact, confirming that the lava was not so hot as to preclude deliberately walking onto it.

My opinions concerning the events leading to Mrs. Gast's death and their psychiatric causes are based on knowledge of Mrs. Gast's psychology from the treatment records of Mr. Magruder and of her psychiatrist, Dr. Johnson, on my own scientific knowledge and experience treating people with Borderline Personality Disorder, on eyewitness accounts of Mrs. Gast's behavior and comments on the day of her death, on physical evidence at the scene of her death, on NPS maps and weather logs for that day, and on my personal knowledge of conditions at the site. Furthermore, I find no evidence at all, nor has there been any credible medical explanation, to support the theory that she left the turnaround

area due to a confusional state. When she left that area, she must have known that returning with her tour would no longer be possible, making the theory that her death was accidental very unlikely. I believe this evidence raises the likelihood that my opinions concerning the psychiatric causes of Mrs. Gast's death are true to a high degree of medical probability.

Sincerely,

Stephen B. Kemble, M.D., F.A.P.A.
Board Certified in Psychiatry by
 The American Board of Psychiatry
 and Neurology